1-99-3704

FIFTH DIVISION

                                         September 14, 2001   

No. 1-99-3704

DERRICK ROBINSON, Successor Independent Adm'r of the Estate of Ralph J. Robinson, a Minor, Deceased,        

Plaintiff-Appellee,

v.

THE CHICAGO PARK DISTRICT, an Illinois Municipal Corporation, 

Defendant-Appellant.

))))) ))))

)))))

Appeal from the

Circuit Court of

Cook County

Honorable

Deborah M. Dooling,

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

In March of 1994 Delores Robinson filed a wrongful death and survival action on behalf of her son Ralph Robinson, a minor, deceased, against the defendant, Chicago Park District.  The suit arose from the accidental drowning of her son during an open swim at the defendant's pool.  During the pendency of the action, Delores Robinson passed away and the plaintiff, Derrick Robinson, was substituted as successor administrator.  

A jury found the defendant liable for negligence and returned a verdict in favor of the plaintiff in the amount of $1,550,000.  The court entered judgment on the verdict on May 4, 1999.  The defendant filed a posttrial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  The court denied defendant's motion and defendant now timely appeals.

On appeal, defendant alleges that it has statutory tort immunity under Section 3-108(b) of the Governmental and Governmental Employees Tort Immunity 745 ILCS 10/3-108(b)(West 1994), and therefore, the trial court committed reversible error by not directing a verdict in favor of the defendant.  Defendant additionally alleges that the amount of damages is not supported by the evidence.

For the following reasons, we reverse.

I.  BACKGROUND

On the afternoon of June 16, 1993, Ralph Robinson and three of his friends went to the Carver Park pool to go swimming.  Carver Park pool, located at Carver Park, 939 East 132nd Place in Chicago, is owned and operated by the defendant.  The pool is enclosed by a glass structure and ranges in depth from 11 feet at its deepest to 3 feet at its shallowest.

At approximately 3 p.m. Ralph and his friends arrived at Carver Park and went into the locker room to change into their swimsuits.  On that afternoon, the pool had a posted open swim in progress and had two lifeguards, Charles Baskin and Kenneth Shores, scheduled to be on duty.  Although Steve Davis, senior lifeguard, was at a meeting and not present on the pool deck, both Baskin and Shores were present on the pool deck that afternoon.  After exiting the locker room, Ralph was given, and passed, a lap test in order to swim in the deep end of the pool.  Baskin administered the test, which consisted of swimming two laps in the deep end and treading water.  Ralph proceeded to the deep end of the pool, where he jumped off the diving board, treaded water, swam to the side and exited the pool.  

The relevant facts that led up to Ralph's drowning were relayed to the jury through the testimony of occurrence witnesses James Griffin, one of Ralph's friends who had accompanied him to the pool, and lifeguard Charles Baskin.

Griffin testified that he arrived at the pool with Ralph Robinson, Darryl Harris and Kevin McClenton at approximately 3:30 p.m. that afternoon.  Griffin stated that he and his friends had been swimming at the Carver pool on previous occasions .  Griffin testified that after showering and changing in the men's locker room he proceeded out to the pool deck and entered the shallow end of the pool alone.  Griffin stated that there were two lifeguards on the pool deck at that time.  At that time, Griffin saw one of the lifeguards on the telephone and one of the lifeguards sitting on a steel bench talking to some people.  Shortly after entering the pool, Griffin saw Ralph jump off the diving board into the deep end of the pool, swim to the edge, and then exit the pool.  Griffin stated that he saw Ralph jump off the diving board a second time.  Griffin testified that he was going under water while in the shallow end and was not watching the activities of the lifeguards at all times.

Griffin testified that he heard Darryl Harris, one of the other boys who had accompanied them to the pool, yelling his name from the deep end of the pool.  Griffin saw Harris standing on the diving board and pointing to the water.  When Griffin walked to the deep end, he saw Ralph lying on the bottom of the pool.  Griffin testified that he began yelling for a lifeguard and waving his hand.  Harris jumped in but was unable to retrieve Ralph.  Griffin testified he and Harris were both yelling and waving for a lifeguard at this point.  Griffin stated that Baskin looked over in their direction but failed to respond.  Griffin testified that eventually Baskin dove into the pool and retrieved Ralph.  Baskin began doing cardiopulmonary resuscitation (CPR) while Shores came running over with an oxygen tank.

Baskin testified that he had been a lifeguard for the Chicago Park District for 11 years.  He stated at trial that he was certified from the American Red Cross and the Chicago Park District in life guarding at the time of the incident.  Baskin testified  that on June 16, 1993 he was working the 1 p.m. to 10 p.m. shift at the Carver Park pool.  Baskin testified that there was a posted open swim that day from 3 p.m. to 5:30 p.m.  He testified that he had positioned himself on a steel bench which was located at the drop off point in the pool to observe "all of the shallow and all of the deep."  Baskin maintained that, while he may have answered questions or explained rules to swimmers, he was not talking to anyone for any length of time while sitting on the bench.   Baskin testified that he remembered giving Ralph his lap test that day.  Baskin knew Ralph because he was a regular at the Carver Park pool and a good swimmer.  Baskin testified that after Ralph passed the swim test, he saw him jump off the diving board into the deep end of the pool.  Baskin stated that he saw Ralph jump off the board, go to the bottom of the pool, come up and tread water a couple of times.  Baskin testified that after the last time he saw Ralph jump in, he did not know he was in distress until, while walking toward the deep end and making his 10-second count, he saw Ralph lying on the bottom of the pool.  Baskin testified that he did not see Ralph in distress on the surface of the water or hear him, or anyone else, calling out for help at any point.  Baskin then dove into the water and brought Ralph to the surface.  Baskin testified that Ralph was not breathing and had no pulse.  At this point Shores ran up with a resuscitator and both men began CPR on Ralph.  Ralph was resuscitated but died several days later at Christ Hospital.

PROCEDURAL HISTORY

Prior to trial, on May 8, 1996, the defendant filed a motion for summary judgment.  The defendant contended that pursuant to the decision rendered three weeks earlier by the Illinois Supreme Court in 
Barnett v. Zion Park District
, 171 Ill. 2d 378, 665 N.E.2d 808 (1996), there were no genuine issues of material fact and therefore summary judgment was appropriate.  Judge James Heyda heard the argument and denied defendant's motion on the grounds that there were material fact issues as to where the lifeguards were positioned.  Defendant's motion for reconsideration or, in the alternative, certification of the question for interlocutory appeal was also denied by Judge Heyda.  Defendant sought to renew its motion for summary judgment before the trial court.  The trial court refused to consider the motion because of Judge Heyda's previous ruling.  At the close of all the evidence the trial judge refused to direct a verdict in favor of the defendant.  The jury returned a verdict in favor of the plaintiff in the amount of $1,550,000. Defendant filed a posttrial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  The motion was denied.  Defendant now appeals.

II.  ANALYSIS

Defendant maintains that the trial court committed reversible error in refusing to direct a verdict in its favor.  Defendant seeks judgment notwithstanding the verdict or, in the alternative, a new trial.  "[V]erdicts ought to be directed and judgments [notwithstanding the verdict] entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).  A motion for directed verdict should be granted where there is no evidence demonstrating a substantial factual dispute or where the assessment of the credibility of witnesses or the determination of conflicting evidence is not decisive to the outcome.  
Maple v. Gustafson
, 151 Ill. 2d 445, 453-54, 603 N.E.2d 508 (1992).  In recognition that trial courts are not to weigh evidence, resolve conflicts in evidence, or assess the credibility of witnesses, a ruling on a motion for directed verdict is subject to 
de novo
 review.  
Dunlap v. Alcuin Montessori School
, 298 Ill. App. 3d 329, 340, 698 N.E.2d 574 (1998).

A. STATUTORY IMMUNITY

Defendant argues that at the close of all the evidence "there were no questions of fact left for the jury to decide that would serve to bar the Park District's statutory immunity under [section] 3-108(b) or that would impose liability on the Park District."  Section 3-108(b) (745 ILCS 10/3-108(b)(West 1994) states:

"Where a local public entity or public employee designates a part of public property to be used for purposes of swimming and establishes and designates by notice posted upon the premises the hours for such use, the entity or public employee is liable only for an injury proximately caused by its failure to provide supervision during the said hours posted."

Specifically, defendant maintains that under 
Barnett
, the Illinois Supreme Court has unequivocally held that a public entity is immune from negligence and willful and wanton conduct when it has lifeguards positioned on the pool deck.  In this case it was an uncontested fact that there were two lifeguards on deck, and therefore, immunity was triggered and a directed verdict was proper.

Plaintiff argues that 
Blankenship v. Peoria Park District
, 269 Ill. App. 3d 416, 647 N.E.2d 287 (1994) carves out an exception to the blanket immunity provided under 
Barnett
.  Specifically, plaintiff maintains that when the conduct of the lifeguards constitutes a "complete lack of supervision" the Act does not apply.  Therefore, according to the plaintiff, it was proper to send the factual issue of whether the lifeguards' conduct in this case constituted a complete lack of supervision to the jury.

We hold that the trial court committed reversible error in denying defendant's motion for a directed verdict.  The seminal case in Illinois interpreting section 3-108(b) (745 ILCS 10/3-108(b)(West 1994) is 
Barnett
.  In 
Barnett
, Travis, a 10-year old boy, drowned in a park district pool during a posted open swim.  As the court noted, there were 6 lifeguards on duty that were "actively overseeing, directing, and managing the pool." 
Barnett
, 171 Ill. 2d at 382-83.  The record revealed that Travis slipped while jumping off a diving board, hit his head and fell into the water.  At least two patrons told lifeguards of Travis' distress but the "lifeguards dismissed their pleas and failed to respond."  
Barnett
, 171 Ill. 2d at 383.  It was a pool patron who eventually dove in and pulled Travis to the surface.  Barnett, as special administrator of the estate of Travis, brought a wrongful death and survival action against the Zion Park District.  The trial court granted summary judgment in favor of the defendant.  On appeal, Barnett argued that the case was improper for summary judgment and that although lifeguards were on the pool deck, their supervision was so deficient that the defendant failed to provide Travis with the "supervision" that section 3-108(b) requires.

The Illinois Supreme Court, in analyzing Barnett's claim, disagreed.  First, the court noted that the case was appropriate for summary judgment.  Barnett labeled the question of whether the lifeguards provided "supervision" within the meaning of section 3-108(b) as a question of fact.  The court stated this issue involves interpreting the Tort Immunity Act, "which is purely a matter of law and appropriate for summary judgment."  
Barnett
, 171 Ill. 2d at 385; see 
Lane v. Titchenel
, 204 Ill. App. 3d 1049, 1053, 562 N.E.2d 1194 (1990). Second, the court disagreed with Barnett's interpretation of section 3-108(b).  "The legislature omitted from the plain language of section 3-108 any reference to the quality of supervision required thereunder.  Thus, the legislature must have intended to provide unconditional immunity for liability when supervision is provided."  
Barnett
, 171 Ill. 2d at 392, 665 N.E.2d 808.  In 
Barnett
 it was undisputed that 6 lifeguards were provided and were physically present.  The court noted that Barnett's interpretation that the statute requires a particular level of supervision would effectively nullify the statute.  "If section 3-108(b) immunized only nonnegligent conduct, then there would be no need for immunity because the conduct would not be actionable in the first place." 
Barnett
, 171 Ill. 2d at 392. 

The case at bar is directly analogous.  Plaintiff is essentially making the identical argument that was made, and rejected, by the plaintiff in 
Barnett
.  Plaintiff claims that the conduct of the lifeguards, although present on the pool deck, rose to the level of a complete failure to provide supervision.  Plaintiff is attempting to limit the immunity granted under section 3-108(b) by reading a requisite level of supervision into the statute.  The Illinois Supreme Court has unequivocally declined to limit the immunity in such a way.  In this case it was uncontroverted that two lifeguards were present on the pool deck.  After defendant requested a special interrogatory which stated that at the time of the occurrence the defendant did have at least one lifeguard on the pool deck, the trial court itself noted "this isn't an issue***I would think the plaintiffs would stipulate that there's one lifeguard***that's not an issue."  Therefore there was "supervision" within the ambit of 
Barnett
, and the defendant is entitled to immunity under section 3-108(b).

Plaintiff relies wholly on the decision in 
Blankenship
 for the proposition that immunity is improper when the lifeguard's conduct constitutes a complete lack of supervision.  In 
Blankenship
, a case which we note predates 
Barnett
, this court held that the defendant was not entitled to immunity under section 3-108(b) because the lifeguards were off-duty, not physically present at the pool, and not in a position to see the pool.  In that case, the plaintiff drowned during an "adult swim" at a public pool.  There were three lifeguards on duty that day; however, during the adult swim, all three of the lifeguards went into a small adjacent room where they were unable to see the pool.  The park district's rules stated that the lifeguards could use "adult swim" for break time but one lifeguard must remain on duty.  The court stated "[a]lthough three lifeguards were ostensibly on duty and were present in the pool area, according to the complaint they were on a break and were not in a position to observe the pool.  This was not mere inattention or a momentary lack of vigilance; it was a complete absence of supervision." 
Blankenship
, 269 Ill. App. 3d at 424.

The case at bar is directly distinguishable.  As stated previously, the defendant provided two lifeguards who were present on the pool deck.  Charles Baskin and Kenneth Shores were 
on
 the pool deck, not in an adjacent room, when Ralph Robinson drowned.  Both the plaintiff and the trial court apparently are interpreting 
Blankenship
 to create a broad exception to 
Barnett
 which allows the jury to delve into a factual inquiry of degrees of supervision.  We do not believe that 
Blankenship
 stands for that proposition.  The majority of plaintiff's argument during trial, and on appeal, is centered on the fact that Baskin and Shores were preoccupied and not paying attention to the pool.  Facts were introduced that Shores was on the telephone with his back to the pool, while Baskin was busy talking to girls on the bleachers.  These facts support plaintiff's theory of "inattention or lack of vigilance
."  Plaintiff argues that these facts bring this case within the ambit of the holding in 
Blankenship
.  We decline to find that 
Blankenship
 permits this type of factual inquiry.  As interpreted by the supreme court in 
Barnett
, 
Blankenship
 stands for the very limited proposition that when lifeguards are not physically present on the pool deck, and, as a result of their absence, they are unable to observe the pool, a complete absence of supervision can be found.  A strong argument could be made 
that if lifeguards are present on the pool deck, but they are completely incapacitated (
i.e.
, unconscious, extremely intoxicated), a court could find a complete absence of supervision.  The facts introduced by plaintiff in this case, taken as true, establish only that the supervision in this case may have been inadequate.  
Barnett
 held that under section 3-108(b), the "adequacy" of the supervision is irrelevant.  We interpret 
Barnett
 to hold that this supervision, adequate or not, entitles the park district to immunity.        

A case that was decided after 
Barnett
 and 
Blankenship
 offers additional support for this finding.  In 
Dixon v. Chicago Board of Education
, 304 Ill. App. 3d 744, 710 N.E.2d 112 (1999), this court held that because the school's swimming coach was on the pool deck when the decedent drowned, "[w]e believe that [this] was 'supervision' as contemplated by the immunity statute." 
Dixon
, 304 Ill. App. 3d at 749. Citing to 
Barnett
, this court noted that the plain language of section 3-108(b) does not require a particular level or degree of supervision.  "Had Blake and the volunteer lifeguard left the pool area while Tiffany was in the water, the facts would fall within 
Blankenship
."  
Dixon
, 304 Ill. App. 3d at 750. 

In this case it was improper for the trial judge to charge the jury with determining the level or degree of supervision provided by the defendant.  The defendant is immune from liability because it was uncontroverted that two lifeguards were present on the pool deck.  Therefore, the trial court should have directed a verdict in the defendant's favor.

In further support of our holding, it should be noted that section 3-108(b) was amended, effective December 2, 1998, to include a willful and wanton exception.  The statute now reads:

"(b) Except as otherwise provided in this Act, neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property unless the employee or the local public entity has a duty to provide supervision imposed by common law, statute, ordinance, code or regulation 
and the local public entity or public employee is guilty of willful and wanton conduct in its failure to provide supervision proximately causing such injury."
 (Emphasis added) Pub. Act 90-805, § 5, eff. December 2, 1998 (amending 745 ILCS 10/3-108(b) (West 1994)). 

As defendant asserts, it appears that the amendment is not to be applied retroactively.  See 
Henrich v. Libertyville High School
, 186 Ill. 2d 381, 712 N.E.2d 298 (1998).  Even if we were to apply the exception retroactively, it would not effect the result in this case.  The record indicates that, in answering the two special interrogatories, the jury specifically found that the conduct of the defendant was not willful and wanton.  The interrogatories read as follows:

"At the time of the occurrence, was the conduct of the lifeguards willful and wanton?                No        At the time of the occurrence, was the conduct of the lifeguards negligent?                              Yes"

The amendment does further evince the intent of the legislature on the issue at hand in this case.  In the amendment, the legislature apparently addressed post-
Barnett
 concerns.  The court in 
Barnett
 found that pre-amended section 3-108(b) granted absolute immunity with no exception for willful and wanton conduct or negligent conduct.  The legislature amended section 3-108(b) to specifically include an exception for willful and wanton conduct but did not include an exception for negligent conduct.  We can only interpret this amendment as clarifying the legislative intent to shield public entities under section 3-108(b) from liability resulting from negligence.  As the court noted in 
Henrich
: 

"It is the province of the legislature to enact laws; it is the province of the courts to construe them. Courts have no legislative powers; courts may not enact or amend statutes.  A court cannot restrict or enlarge the meaning of an unambiguous statute. The responsibility for the justice or wisdom of legislation rests upon the legislature. {Citations.]  A court must interpret and apply statutes in the manner in which they are written.  A court must not rewrite statutes to make them consistent with the court's idea of orderliness and public policy."  
Henrich
, 186 Ill. 2d at 394-95.
  

Similarly, we will not depart from the statute's plain language by reading into it exceptions, limitations or conditions that conflict with the express legislative intent.  
In re Consolidated Objections to Tax Levies of School District No. 205
, 193 Ill. 2d 490, 496, 739 N.E.2d 508 (2000). 

B. DAMAGES

Defendant makes an additional argument, in the alternative, challenging the amount of the judgment.  Defendant alleges that the trial court's exclusion of relevant evidence resulted in an award based on sympathy and emotion.  Because of our finding that the defendant is entitled to immunity from liability, we need not address this claim.

For the foregoing reasons, we set aside the jury verdict, vacate the judgment entered upon the verdict and enter judgment notwithstanding the verdict in favor of the defendant.   

Accordingly, 
we reverse the decision of the trial court
.

Reversed.

GREIMAN and THEIS, JJ., concur.