DANIEL HALLOWELL and CAROL HALLOWELL, ) Appeal from the

Indiv. and as Co-Special Adm'rs of ) Circuit Court of

the Estate of Amy Hallowell, a Minor, ) Cook County.

Deceased, ) 

)

Plaintiffs-Appellees, )

)

) 

)

THE UNIVERSITY OF CHICAGO HOSPITAL, ) 

a Corporation, d/b/a Wyler Children's ) 

Hospital; J. DEANE WALDMAN, ) 

) 

Defendants-Appellants. )

________________________________________) ) No. 94 L 16986

DANIEL HALLOWELL and CAROL HALLOWELL, ) 

Indiv. and as Co-Special Adm'rs of ) 

the Estate of Amy Hallowell, a Minor, ) 

Deceased, ) 

)

Plaintiffs-Appellants, )

) 

) 

)

MIDWEST PEDIATRIC CARDIOLOGY, P.C., a )

corporation; OTTO G. THILENIUS,       ) 

and THOMAS E. BUMP, ) Honorable

) Sharon J. Coleman,

Defendants-Appellees. ) Judge Presiding.

JUSTICE REID delivered the opinion of the court:

Following a jury trial, a verdict was entered against  defendants the University of Chicago Hospital, a corporation, doing business as Wyler Children's Hospital (Wyler's), and J. Deane Waldman, M.D. (Dr. Waldman), for the wrongful death of Amy Hallowell.  The jury also found defendants Midwest Pediatric Cardiology, P.C. (Midwest), Otto Thilenius, M.D. (Dr. Thilenius), and Thomas E. Bump, M.D. (Dr. Bump), not liable.  The jury awarded the plaintiffs, Daniel and Carol Hallowell (the Hallowells), $8 million in damages.  These two consolidated appeals followed.

In their appeal, Wyler and Dr. Waldman assert the trial court erred when it denied their motions for a judgment notwithstanding the verdict (judgment 
n.o.v.
) or a new trial.  In particular, Wyler and Dr. Waldman contend the trial court improperly granted the Hallowells' motion 
in
 
limine
 that barred Dr. Waldman from testifying about a telephone conversation in which Mrs. Hallowell allegedly informed another Wyler employee that Dr. Waldman was no longer going to be Amy's physician.

On appeal, the Hallowells argue the trial court erred when it denied their posttrial motions for a judgment 
n.o.v.
 or a new trial as to Midwest, Dr. Thilenius and Dr. Bump.  The Hallowells maintain there was overwhelming evidence introduced at trial which proved that Dr. Thilenius and Dr. Bump failed to follow the standard of care when they neglected to recommend or to provide the Hallowells with information concerning the possibility of Amy receiving an implantable cardiac defibrillator (ICD).

For the reasons that follow, we affirm the decisions of the trial court.

THE FACTS

On May 20, 1992, nine-year-old Amy suffered a cardiac arrest while participating in a swim meet.  After being removed from the swimming pool, Amy was found to be in a state of ventricular fibrillation.  Paramedics performed cardiopulmonary resuscitation and defibrillated Amy's heart.  

After being resuscitated, Amy was taken to Wyler, where she was treated by Dr. Waldman, a pediatric cardiologist, who eventually became Amy's attending cardiologist.  An electrocardiogram (EKG) revealed that Amy had abnormal heart rhythm patterns or heart arrhythmias.  Amy was also found to have very low potassium levels, the ultimate cause of which was never ascertained.  Dr. Waldman was able to determine that Amy's heart was structurally normal by using an echocardiograph, which is an instrument used for diagnosing heart abnormalities.

On June 9, 1992, Amy's charts indicated that a nurse, an endocrinologist, a resident and a pediatrician observed that Amy experienced heart arrhythmias.  However, at trial, Dr. Waldman testified that he did not believe that Amy experienced arrhythmias.  Amy's potassium levels were also checked and were found to be normal.  When Amy was discharged on June 10, 1992, Dr. Waldman had not determined the cause of her cardiac difficulties and did not prescribe any medications. 

On June 24, 1992, a Holter monitor study was performed on Amy.  The study revealed that Amy was experiencing arrhythmias.  Her potassium levels were determined to be normal.  At trial, Dr. Waldman admitted that in a deposition taken prior to trial, he stated that he felt that as a result of the Holter monitor study, Amy's condition was recurrent rather than a single isolated event.  At this time, Dr. Waldman initially prescribed Inderal; however, Amy was eventually switched to Verapamil.

In March 1993, Amy's mother, Mrs. Hallowell, sought a second opinion from Dr. Thilenius, a pediatric cardiologist who was an employee of Midwest.  Dr. Thilenius performed a general physical examination and listened to Amy's heart.  His findings were normal.  Dr. Thilenius did not have any further contact with Amy until December 1993.

In October 1993, Dr. Waldman had Amy undergo a stress test.

The test results did not indicate the etiology of Amy's arrhythmias.  Dr. Waldman also recommended that Amy undergo an electrophysiology (EP) study and an ablation procedure.  Dr. Waldman suggested that Dr. Bump perform the procedures.  Dr. Bump is a cardiologist with an expertise in electrophysiology, which is the study of heart rhythms.

The Hallowells were familiar with Dr. Bump because he had previously treated their nephew for a similar condition with the same or similar procedure.  Dr. Bump sought the involvement of Dr. Thilenius for the EP study, which was performed on December 29, 1993.  After performing the test, the doctors were still unable to locate a ventricular source for Amy's abnormal heart condition.

On April 29, 1994, Amy became dizzy while taking a shower and collapsed.  When the paramedics arrived, they found Amy in ventricular fibrillation due to cardiac arrest.  Shortly thereafter, Amy was pronounced dead.

On December 30, 1994, the Hallowells filed their initial complaint against several individuals and entities, including Wyler, Dr. Waldman, Dr. Bump, Dr. Thilenius and Midwest, alleging that they were medically negligent in their care and treatment of Amy.  Following a jury trial, a verdict was entered against Wyler's and Dr. Waldman and the plaintiffs were awarded $6 million for loss of society and $2 million for pain and suffering.  The jury also returned a verdict in favor of Midwest, Dr. Bump and Dr. Thilenius.

On July 28, 2000, the Hallowells filed posttrial motions for a judgment 
n.o.v.
 and for a new trial as to Dr. Thilenius, Midwest and Dr. Bump.  On August 1, 2000, Wyler and Dr. Waldman also filed posttrial motions requesting a
 judgment 
n.o.v.
 and a new trial.  On December 27, 2000, the trial court denied all posttrial motions filed by both the plaintiffs and the defendants.  Subsequently, the Hallowells timely filed their notice of appeal, on January 23, 2001, and on January 25, 2001, Wyler and Dr. Waldman timely filed their notice of appeal.

ANALYSIS

I.  Wyler and Dr. Waldman's Appeal  

Wyler and Dr. Waldman assert the trial court erred when it granted a motion 
in
 
limine
 that precluded Dr. Waldman from testifying about the content of a telephone conversation that allegedly took place between Mrs. Hallowell and Michaeline Wallig.  Wallig, the head administrator of the cardiology department at Wyler, allegedly telephoned Mrs. Hallowell after Amy underwent the EP to discuss a follow-up appointment.  During their conversation, Mrs. Hallowell allegedly informed Wallig that Amy would be going elsewhere for a follow-up appointment.  

Dr. Waldman maintains the testimony should have been admitted.  Dr. Waldman argues the barred testimony was offered to show his state of mind and to explain his subsequent course of conduct and, as such, is not hearsay. 

In response, the Hallowells contend the restricted testimony was either hearsay or vague because it was speculative and unreliable.  The Hallowells allege that the testimony was hearsay because it was not offered to show Dr. Waldman's state of mind but rather to prove the truth of the matter asserted therein, which was that the Hallowells had discharged Dr. Waldman as Amy's physician.  We agree.

A motion 
in
 
limine
 is addressed to the trial court's

inherent power to admit or exclude evidence.  Generally, we will not disturb the trial court's ruling on a motion 
in
 
limine
 absent a clear abuse of discretion.  However, a trial court must exercise its discretion within the bounds of the law.
  
Beehn v. Eppard
, 321 Ill. App. 3d 677, 680-81 (2001), citing 
People v. Williams
, 188 Ill. 2d 365, 369 (1999).

The trial court's decision to grant the Hallowells' motion 
in
 
limine
 to bar Dr. Waldman from testifying about a conversation that allegedly took place between Wallig and Mrs. Hallowell was proper.  Dr. Waldman's testimony clearly would have been hearsay. 

"An out-of-court statement that is offered as proof of the matter asserted in court is hearsay and, therefore, inadmissible. (
People v. Carpenter
 (1963), 28 Ill. 2d 116, 121.)  The distinction between admissible testimony and inadmissible hearsay is illustrated by the 'example of the witness A testifying that "B told me that event X occurred."  If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible--if offered to prove that event X occurred, it is clearly inadmissible.'  
Carpenter
, 28 Ill. 2d at 121."  
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 99 (1995).

Here, Dr. Waldman's testimony was clearly offered to prove that he was discharged as Amy's physician.  After examining Dr. Waldman's barred testimony, it is clear to this court that it was not offered to show his state of mind or that the purported conversation between Mrs. Hallowell and Wallig occurred.  Instead, it was clearly offered to show that he was no longer Amy's physician.  Even in arguing that the purported testimony was not hearsay, in the appellants' brief, the opening sentence under the argument section contradicts their contentions when it states:  "The trial court erred in refusing to permit Defendant Waldman to testify that he had been discharged by the Plaintiff."  We also note that the barred testimony could have been elicited from Mrs. Hallowell during her cross-examination or from Wallig, who was not called as a witness.  Strangely, neither of these things was done during trial.  If the testimony was so important, why did the defense not avail themselves of these options?  The trial court's order granting the Hallowells' motion 
in
 
limine
 did not bar these alternatives.  Here, the trial court did not abuse its discretion.

The trial court's decision was also correct because the testimony was too speculative.  During his deposition, Dr. Waldman said that Wallig called Mrs. Hallowell about a follow-up appointment, and Mrs. Hallowell informed Wallig that Amy would be seeing another doctor instead.  However, Dr. Waldman could not remember specifically what Wallig told him.  Dr. Waldman said that he could not remember the details of what Wallig told him but, rather, could only state the "gist" of their conversation.  This clearly is inadequate.

II.  The Hallowells' Appeal

The Hallowells contend the trial court erred when it denied their posttrial motions for a judgment 
n.o.v.
 and a new trial.  The Hallowells maintain that overwhelming evidence was introduced at trial which proved that defendants Midwest, Dr. Thilenius and Dr. Bump failed to follow the standard of care when they neglected to recommend or to provide the Hallowells with information concerning the possibility of Amy receiving an ICD.  In particular, the Hallowells assert the testimony of their two expert witnesses, Dr. Jeanny Kim Park and Dr. Robert Achtel, prove the defendants failed to follow the appropriate standard of care.

The said defendants argue the trial court's decision to deny the Hallowells' posttrial motions was proper.  Specifically, these defendants assert their expert witnesses, Dr. Paul Gillette and Dr. William Hellenbrand, provided testimony that supported their contention that they did not breach the standard of care in their treatment of Amy.  We agree.

Verdicts ought to be directed and judgments 
n.o.v.
 entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510 (1967).  In recognition that trial courts are not to weigh evidence, resolve conflicts in evidence, or assess the credibility of witnesses, a ruling on a motion for directed verdict is subject to 
de
 
novo
 review.  
Robinson v. Chicago Park District
, 325 Ill. App. 3d 493, 497 (2001), citing 
Dunlap v. Alcuin Montessori School
, 298 Ill. App. 3d 329, 340 (1998).

"A court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion.  [Citations.]  In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial.  [Citation.]  Furthermore, it is important to keep in mind that '"[t]he presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility."' [Citation.]  If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial.  [Citations.]"  
Maple v. Gustafson
, 151 Ill. 2d 445, 455-56 (1992).  A verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.  
Bielaga v. Mozdzeniak
, 328 Ill. App. 3d 291, 299 (2002), citing
 
Tedrowe v. Burlington Northern, Inc.
, 158 Ill. App. 3d 438, 443 (1987), citing 
Mizowek v. De Franco
, 64 Ill. 2d 303, 310 (1976), 
Demos v. Ferris-Shell Oil Co.
, 317 Ill. App. 3d 41, 52 (2000)
. 

"[W]here conflicting expert testimony is introduced at trial, it is the province of the jury as the trier of fact to resolve the conflict.  [Citations.]  Although this court is required to scrutinize the evidence in a medical malpractice action when reviewing a denial of a motion for a judgment 
n.o.v.
 or a new trial [citations], we will not sit as a second jury and reweigh the evidence or reevaluate the credibility of the witnesses.  [Citations.]" 
 
Dabros v. Wang
, 243 Ill. App. 3d 259, 264 (1993). 

In this case, the Hallowells presented expert witness testimony which stated that the defendants deviated from the standard of care.  In particular, Dr. Park testified that it was her opinion that Drs. Bump, Thilenius and Waldman breached the standard of care when they failed to give the Hallowells information about an ICD for Amy.  In Dr. Park's opinion, she testified that the doctors had an obligation under the standard of care to provide this information to the Hallowells.  During her testimony, Dr. Park stated:

"A. They should have recommended the defibrillator implant because, again, she was someone who had [been] presented with sudden death and she at least was able to be resuscitated so she had a second chance and she was at high risk for recurrence as evidenced by her follow-up studies, and knowing that medication is not 100 percent effective, that the next thing closest to that would have been the defibrillator."

Dr. Achtel also testified that it was his medical opinion that the defendants' treatment of Amy deviated from the standard of care.  Dr. Achtel's testimony follows:

"Q.  Now, do you have an opinion, sir, as to whether Dr[s]. Waldman, Bump and Thilenius following this EP study had an obligation to meet the standard of care of providing information about the implantable cardiodefibrillator to Amy and her parents?

* * *

A.  Yes, I do.

Q.  What is that opinion, sir?

A.  I believe that the parents should have been informed as to the option of implanting an ICD."

The Hallowells also claim the defendants' argument that they did not advise them about an ICD because of Amy's low potassium levels is disingenuous.  Specifically, the Hallowells claim the defendants were aware that Amy had experienced arrhythmias while exhibiting normal levels of potassium.  Our review of the record reveals that Dr. Thilenius and Dr. Bump gave testimony which suggested that each doctor may have been aware that Amy had experienced arrhythmias, although her potassium levels were normal.

However, the testimony of Dr. Park and Dr. Achtel was directly contradicted by that of the defendants' expert witnesses, Dr. Gillette and Dr. Hellenbrand.  The defendants' experts testified that it was their medical opinion that the defendants did not deviate from the standard of care during Amy's treatment.  

The following testimony was elicited from Dr. Gillette at trial:

"Q.  After reviewing the materials in this case, did you reach an opinion whether Dr. Bump complied with the standard of care in his entire interaction with Amy Hallowell?

A.  I did.

Q.  What is that opinion, Dr. Gillette?

A.  I believe that he did keep within the standard of care."

At trial, Dr. Hellenbrand testified that he did not think that ICDs were the standard of care at the time of Amy's treatment.  The following is testimony from Dr. Hellenbrand:

"A.  The internal–-the cardiac defibrillators that were available in '92 and '94 for pediatrics were really the one being used in adults.  They were very large boxes, maybe that big and that deep.

And they had to be implanted under the skin in the abdomen.  And, Amy was a very thin young lady.  And this would have been a difficult procedure to do.  It would have protruded.  And had some risks associated with it.

It would have required a major incision in the chest to place the actual wires on the heart to deliver the energy from this big box to do that.  So it's a major surgical procedure to do that at that point in time.

It just was not the standard of care at the time.  It was basically considered if medical therapy was not successful.

* * *

Q.  Doctor, based upon all the information that you have reviewed in this case, have you formed an opinion as to whether or not Dr. Thilenius' role in this case satisfied the standard of care applicable to pediatric cardiologists in 1993 and 1994?

A.  Yes, I have.

Q.  What is your opinion?

A.  I believe he acted totally according to the standard of care."

People qualified in their fields stated their views and gave their reasons for these opinions.  Nothing was said that was not grounded somewhere in the evidence.  Not so surprisingly, the plaintiffs' experts did not agree with the defendants' experts--not an unusual situation as trials go.  We note that plaintiffs' expert, Dr. Park, had been a doctor only since 1993 and she could not recall ever having used the ICD model that she testified should have been recommended to the Hallowells.  Conversely, Dr. Bump had been an electrophysiologist since 1982 and had conducted research on the use of ICDs, authoring five articles on ICDs as treatment for arrhythmia.  He had 50 to 100 patients with ICDs in place at the time of trial.  Defense expert Dr. Gillette was one of the first pediatric cardiologists to pursue electro-physiology.  He authored eight books about cardiac rhythm issues.  It was the jury's job to listen to the conflicting evidence and use its best judgment about where the truth could be found.  This is what juries do best, and there is no reason to believe it did not do its job in this case.  We will not second-guess a jury without a good reason.  In this case, we find no reason to doubt the jury's decision.  See 
Harris Trust & Savings Bank v. Abraham-Zwirn
, 314 Ill. App. 3d 527 (2000); 
Dabros v. Wang
, 243 Ill. App. 3d 259 (1993).

CONCLUSION

For the foregoing reasons, the decisions of the trial court are affirmed.

Affirmed.