KATHLEEN M. MARTIN, Plaintiff-Appellant, v. JOEL D. SALLY, Defendant-Appellee.

Second District    No. 2—02—0829

Opinion filed July 3, 2003.—Rehearing denied August 1, 2003.

BOWMAN, J., specially concurring in part and dissenting in part.

James D. Sparkman, of Pete Sullivan & Associates, P.C., of Rockford, for appellant.

William M. Goff, of Mateer & Associates, of Rockford, for appellee.

JUSTICE BYRNE delivered the opinion of the court:

Plaintiff, Kathleen M. Martin, filed suit against defendant, Joel D. Sally, seeking to recover damages for personal injuries allegedly sustained from a motor vehicle accident. Defendant admitted negligence but denied that plaintiff's preexisting injury was aggravated from the accident and denied that plaintiff sustained any injuries by the accident. After hearing the evidence, the jury returned a verdict in favor of defendant. We affirm.

## FACTS

Before trial began, both parties filed motions *in limine*. Plaintiff's motion requested that the trial court bar defendant from eliciting testimony from his expert engineering witness, Mark Strauss, that no human could be injured in this type of occurrence and that plaintiff could not have been injured in this occurrence. The trial court denied her motion.

Defendant's motion *in limine* requested that plaintiff be barred from presenting evidence that, following the collision, her son was crying, was claiming to have been injured in the accident, was taken by ambulance to the hospital, or was evaluated and treated. Plaintiff argued that the evidence was relevant because she would be testifying at trial that she was so concerned at the time of the accident that her son might be injured due to his recent appendectomy surgery that she focused her attention on her son's condition rather than her own, and she therefore did not complain of any injuries to the investigating police officer at the scene of the accident. The trial court granted defendant's motion.

Based on the trial court's ruling that defendant could present testimony from his engineer that no human body could have been injured in the accident, plaintiff filed a motion *in limine* in which she sought to be allowed to present in rebuttal the testimony that her son was crying, he claimed to have been injured, he was taken by ambulance to a hospital, and he received treatment at the hospital for possible injuries. The motion was denied.

The trial court, however, allowed plaintiff to make an offer of proof on the issues as to why she did not complain of her own injury at the scene of the accident and as to whether the impact was such that a person could have been injured in the accident. Plaintiff testified that her 11-year-old son, Cory, was a front seat passenger in the van at the time of the accident. At the moment of impact, she witnessed his body move back and forth. Immediately after the accident, she had a brief conversation with defendant, and when plaintiff finished speaking with him, she noticed Cory crying. She noticed that Cory's head was down and he was leaning forward. Cory told her that his back and neck hurt. Plaintiff "freaked out," wondering what to do, because Cory had just undergone an appendectomy weeks before. Plaintiff then called 911 and an ambulance took Cory to the hospital. Cory was evaluated and released that same day. Cory was "uncomfortable" and took a Tylenol but never required any further medical care.

The following facts were presented at trial. On July 10, 1998, plaintiff was driving a 1990 Dodge Caravan westbound on Halsted Street in Rockford and brought her van to a stop at a red light at the intersection of Huffman Boulevard. Cory was seated in the front passenger seat of the van. Defendant was driving a 1988 Chevrolet 1500 pick-up truck westbound on Halsted Street behind plaintiff. It had been raining and the pavement was wet. As defendant approached the red light at the intersection, he saw plaintiff's van in front of him. He applied the brakes, but his tires began skidding on the wet pavement and the front of his truck struck the rear of plaintiff's van. According

to defendant, his truck was traveling between five and seven miles per hour when it "squarely" impacted the rear end of plaintiff's van.

Following the accident, both plaintiff and defendant left their vehicles and looked to see if there was any damage. Plaintiff's van was equipped with a trailer hitch at the time. Both parties agreed that there was no damage done to either vehicle, although defendant did see a small dimple in his license plate. Plaintiff admitted that she told defendant that she was all right and she did not complain of any symptoms at the time.

Prior to the accident, plaintiff twice had injured her back while working, once in 1997 and again in March 1998. Plaintiff injured her back on a third occasion in April 1998, while helping her family move. Following these injuries, plaintiff was treated by Drs. Robert Porter, Melinda Carter, and Charles Wright. An MRI of plaintiff's lumbar spine taken on May 6, 1998, showed a disc protrusion at the L4-L5 level. Because of the back injury in April, plaintiff had stopped working and she was not working at the time of the accident at issue. Plaintiff had been in physical therapy treatment and taking medication as prescribed by Dr. Wright due to her injury.

Plaintiff did not seek any medical attention on the day of the accident or within three days following the accident. She admitted telling the therapist on July 13, 1998, that she was feeling gradually improved. On July 14, 1998, four days after the accident, plaintiff attended a physical therapy appointment, which had been scheduled before the accident. She did not see Dr. Wright after the accident until August 6, 1998, and that appointment also had been scheduled before the accident. Plaintiff continued going to her regularly scheduled physical therapy appointments.

Plaintiff explained that her back and neck were sore from the accident but because she already was under a doctor's care and already was taking pain medication, she did not go to a doctor or hospital for extra care. Plaintiff noticed that her symptoms were getting progressively worse, more than she had ever experienced. Immediately before the accident, plaintiff had been improving to the point where she was feeling like returning to work on a part-time basis.

Dr. Carter, plaintiff's family practitioner, ordered a second MRI of the lumbar spine, which was taken on July 23, 1998. When she ordered the second MRI, Dr. Carter was not aware that plaintiff had been involved in the accident on July 10, 1998. On August 11, 1998, plaintiff's surgeon, Dr. Wright, performed a lumbar discectomy at the L4-L5 level.

At trial, Dr. Wright testified for plaintiff by way of an evidence deposition. He opined that the surgery he performed was causally

related to the accident at issue. On cross-examination, however, Wright conceded that his initial clinical examination of plaintiff on May 15, 1998, did not correlate with the MRI of the lumbar spine that had been done on May 6, 1998, because he expected to see a greater degree of disc protrusion and more nerve root compression to the left side. Wright also conceded that any type of heavy physical exertion such as gardening can cause a disc protrusion to progress.

Wright further testified on cross-examination that when he initially gave his opinion that the accident aggravated plaintiff's injuries, as shown by the preaccident and postaccident MRIs, plaintiff had not given him any specific information about the accident. He did not know whether it was a front-end or a rear-end collision or the severity of the impact between the two vehicles. When questioned, Wright admitted that the greater the force of trauma, the greater the likelihood of having a disc protrusion progress and that the lighter the impact between the vehicles, the less likely it would be for a disc protrusion to progress. Wright observed that if, in fact, a patient experienced progression of a disc protrusion as a result of a single traumatic event, it is more common than not that the patient would notice increased symptoms immediately following the impact or quite shortly thereafter. After viewing the photographs of the vehicles, defense counsel asked whether it remained "very possible that [plaintiff's] disk was not injured or aggravated in any way as a result of the accident at issue." Wright responded that, if he was going solely on the basis of the presence or absence of damage to the vehicles, that would be a "fair statement," although it ignored certain variables that could magnify or limit the effect of an impact, and that information was unavailable.

By way of a videotaped evidence deposition, defendant called Dr. Steven Delheimer. Delheimer believed that plaintiff had degenerative disc disease, which can produce herniated discs or disc bulges and which can progress or worsen with age. In comparing the preaccident and postaccident MRIs of plaintiff's lumbar spine, Delheimer believed that there was not a significant difference between them. He believed that the extruded disc fragment seen by Wright during the surgery performed on plaintiff was probably present in May 1998 before the accident at issue. He also believed that the surgery performed on plaintiff would have become necessary even if plaintiff had not been involved in a motor vehicle accident, because of the degenerative disc disease and the fact that the extruded disc fragment was probably present in May before the accident. Delheimer explained that symptoms of pain can "wax and wane on their own," and an example of this was in plaintiff's medical records, which revealed that on July

9, 1998, she reported to her physical therapist that she had increased symptoms of pain and wondered whether they were related to gardening. Delheimer also remarked that plaintiff was significantly overweight, which he believed was an ongoing material factor in her complaints of lower back pain.

Based upon a review of the medical records, the two MRIs, and the photographs of the vehicles involved in the accident, Delheimer concluded that plaintiff's injury was due to an extruded disc fragment that was present prior to the accident. The symptoms from that disc fragment were waxing and waning, and if she had had surgery at the time of Wright's initial evaluation, an extruded disc fragment would have been found, even in the absence of the accident. He saw no damage to the vehicles and found it difficult to believe, based upon common sense, that the accident was a material factor in plaintiff's need for surgery or her further symptoms.

Defendant also called Mark Strauss by way of a videotaped evidence deposition. Strauss is an accident reconstructionist and biomechanicist. His training and professional experience involved the study of how humans may or may not be injured in different types of vehicular accidents. Strauss testified that he reviewed the police report, deposition transcripts, and photographs taken of both vehicles after the accident. He also researched measurements of an exemplar Dodge Caravan such as the one operated by plaintiff, and he testified about studies of whether the human body could be injured in low-speed, rear-end impacts.

Strauss was able to determine that the materials he reviewed supported defendant's estimation that his vehicle was traveling between five and seven miles per hour when it struck plaintiff's vehicle. He stated there was nothing in the photographs that would indicate that the contact between the two vehicles was anything other than a low-speed impact and that the "delta V" of plaintiff's vehicle (the maximum speed that plaintiff's vehicle achieved due to the impact) was approximately three to five miles per hour.

Strauss further testified as to the results of studies done in the field of biomedical engineering, which attempted to determine what injuries would result to humans in low-speed impacts. He testified that these studies and tests were all subjected to a peer review process, used methodology or techniques firmly established in the field of biomechanical engineering, and were scientifically performed. He also testified that the tests were performed not only by independent researchers, but also by university labs and by the government to establish the safety of vehicles. These tests, which were empirical, showed that in rear-end impacts involving speeds of 10 miles per hour

from one vehicle into the back of another, the human volunteers showed either no symptoms or only muscle tension or slight damage to the tissues in the neck and the shoulder, and sometimes the volunteers experienced headaches. However, Strauss noted that in none of the human volunteers was there any injury or damage sustained to the lower back, even in volunteers who had abnormalities of disc degeneration in their lumbar spines according to pretesting MRIs. Strauss noted that, compared to the neck area, the back is a totally different structure, which is stronger than the neck and is supported by the vehicle's seat back and its foam. Based on his review of the materials and scientific research, Strauss was of the opinion that the impact or contact between the two vehicles in the accident at issue was not sufficient to aggravate any condition in plaintiff's back that existed prior to the accident, including her protruding disc at the L4-L5 level.

After hearing evidence, the jury returned a verdict in favor of defendant. Following the denial of her motion for a new trial, plaintiff timely appeals. She contends that the trial court erred by granting and denying certain motions *in limine* because it: (1) allowed defendant's expert witness to testify that no human could have been injured in the accident and that the impact was insufficient to aggravate any preexisting condition in plaintiff's back; and (2) barred plaintiff from presenting evidence that her son was crying or injured after the accident to rebut defendant's expert witness's testimony that no human could have been injured and to explain why she did not complain of her own injuries to the police officer at the scene of the accident.

## ANALYSIS

■ At issue are several evidentiary rulings rendered by the trial court in its consideration of the motions *in limine* brought by the parties to this appeal. Motions *in limine* are designed to produce a trial without the introduction of prejudicial material. *Konieczny v. Kamin Builders, Inc.*, 304 Ill. App. 3d 131, 136 (1999). On review, a trial court judge maintains broad discretion in the admission of evidence and in ruling upon a motion *in limine. Green v. Union Pacific R.R. Co.*, 269 Ill. App. 3d 1075, 1082 (1995). A trial court's decision on a motion *in limine* will not be disturbed absent an abuse of discretion. *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 210 (2002). In case of trial court error, a reversal is called for only if the evidence improperly admitted was sufficiently prejudicial to change the outcome of the trial. *Cairns v. Hansen*, 170 Ill. App. 3d 505, 511 (1988).

### 1. Testimony of Defendant's Expert Witness

In the first issue on appeal, plaintiff contends that the trial court

erred in allowing Strauss to testify that the impact or contact between the two vehicles was not sufficient to injure any human or aggravate any condition in plaintiff's back that existed prior to the accident, including her protruding disc. Plaintiff asserts that Strauss should not have been allowed to testify on the subject because his testimony was irrelevant and based on speculation and matters of common knowledge.

■ Expert testimony is admissible at trial when the expert has knowledge or experience not common to a layperson and that knowledge or experience would aid the trier of fact in determining the facts at issue. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 10 (2001); *Augenstein v. Pulley*, 191 Ill. App. 3d 664, 681 (1989). The critical issue is whether the expert's legal testimony aids the trier of fact by explaining a factual issue beyond its ordinary knowledge or whether the opinion merely recites a legal conclusion. *Eychaner v. Gross*, 321 Ill. App. 3d 759, 779 (2001). The admission of expert testimony is within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *In re Detention of Tittlebach*, 324 Ill. App. 3d at 10.

■ Strauss was qualified as an accident reconstructionist, biomechanicist, and biomedical engineer. Part of his professional experience as a biomedical engineer included the study of how humans may be injured in different types of vehicular traumas. Strauss opined that no human could have been injured in the accident. Strauss was also asked "whether the impact or contact between these vehicles would have been sufficient to aggravate any preexisting condition that the plaintiff had in her back such as a protruding disc at the L4-5 level." He believed that this could not have aggravated her preexisting condition because "this is a case where the back is cradled and cushioned by the seat back and the foam, and the delta V, that is, the speed of impact and the change in velocity of the [plaintiff's] van, is approximately in the range of a person walking briskly. This is not at all a high speed impact. This is very low."

We find that Strauss was improperly allowed to testify because he rendered an opinion as to individuals in general, which had no relevance to plaintiff. That other individuals might not suffer injuries in low-impact vehicular crashes has no bearing on whether this particular plaintiff might have suffered injury in this particular crash.

Moreover, the trial court erred in allowing Strauss to testify that plaintiff could not have been injured in the accident. The admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable. *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122 (2001). There is no indication in the record that, in rendering his

opinion, Strauss considered plaintiff's weight, height, and age, whether plaintiff wore a seat belt, how she was seated, or how extensive her preexisting injuries were at the time of the crash. In short, the focus of his opinion was based on generalities that were not tied to plaintiff specifically. Accordingly, we find that the trial court abused its discretion in allowing Strauss to testify that the low-speed impact of the crash could not have injured humans and erred in allowing Strauss to testify that the accident did not exacerbate plaintiff's preaccident injury or condition.

Although we find error, we do not find that a reversal is called for in this case because we determine that the error here was not prejudicial under the circumstances. We will not reverse an erroneous ruling unless the error was prejudicial or the result of the trial was materially affected. *Stricklin v. Chapman*, 197 Ill. App. 3d 385, 388 (1990). The burden is on the party seeking reversal to establish prejudice. *Cairns*, 170 Ill. App. 3d at 511.

Examination of the record discloses several facts from which we determine that the error was not prejudicial and did not affect the outcome of the trial. Dr. Delheimer, the neurosurgeon who examined plaintiff and reviewed her medical records and films on defendant's behalf, believed that the surgery performed by plaintiff's treating physician had no causal relationship to the accident. It was his belief that, prior to the accident, plaintiff had a degenerative disc disease of her lumbar spine and an extruded disc fragment present, which eventually led her to surgery. This belief was also based on the lack of damage to the vehicles, as shown by the photographs. He also believed that plaintiff's obesity was a major contributing factor to her ongoing problems. In addition, plaintiff's surgeon, Dr. Wright, testified that when he first gave his opinion he did not know any specific details of how the accident occurred and did not know the severity of the impact between the two vehicles. He admitted, after viewing the photographs of the vehicles taken after the accident, that it was very possible that plaintiff's disc was not injured or aggravated as a result of the accident at issue.

Furthermore, the jury was aware that, at the time of the accident, defendant's vehicle rear-ended plaintiff's vehicle at the speed of between five and seven miles per hour, the vehicles were not damaged, and plaintiff did not complain of any injuries at the time or for several days thereafter. Thus, given these facts and the testimony of the other expert witnesses, the jury's verdict would not have been different if Strauss had been barred from testifying.

### 2. Evidence of Crying or Injury to Plaintiff's Son

■ Plaintiff next argues that the trial court erred in barring her

from presenting evidence to rebut Strauss's opinion that no human could have been injured in the accident. Plaintiff asserts that "if it was error to allow Defendant's engineer to testify that no human could have been injured in the accident, the error was compounded by the court's refusal to allow Plaintiff to present rebuttal evidence on that very point." Plaintiff alleges that her son was prepared to testify that he was injured in the accident.

The trial court gave plaintiff the opportunity to present evidence to rebut the testimony of defendant's expert witness. In submitting only her own self-serving and unqualified statements, plaintiff offered insufficient proof. On that basis, we find no error.

Plaintiff also asserts that the trial court erred by barring her from presenting evidence that her son was crying or injured after the accident to show her state of mind and to explain her reason for not complaining of her own injury to the police officer at the scene of the accident.

In her discovery deposition, plaintiff stated that, after she told defendant that she was not injured following the accident, she returned to her van and noticed that her son, who had recently undergone appendectomy surgery, was crying. She told defendant that she was going to call the police and an ambulance for her son as a precautionary measure. Based on this deposition testimony, defendant filed a motion *in limine* to bar any evidence at trial that plaintiff's son was "crying, claimed to have been injured and was taken by ambulance to a hospital and evaluated or received treatment at the hospital for possible injuries or as a precautionary measure" because plaintiff had not disclosed any opinion witness who believed that plaintiff's son was injured.

At the hearing on the motion, plaintiff explained that she was so concerned for her son's welfare that she paid no attention to her own condition. Plaintiff argued that such evidence was relevant to her case because it gave her a reason as to why she told the investigating police officer at the scene that she was not injured. In her offer of proof, plaintiff testified that Cory was crying and complained that his back and neck hurt, but she did not provide any medical documentation of his injury and stated that Cory never required any medical care other than a Tylenol.

The trial court granted defendant's motion, but only on the condition that defendant be barred from calling the investigating police officer to testify that plaintiff told him at the scene that she had not been injured. The trial court based its decision on the probative value of the evidence versus the prejudicial effect it could have on defendant's case. The court also based its decision on the fact that

plaintiff never disclosed any opinion witnesses or documentation that Cory had sustained any injuries as a proximate result of the accident. The court stated, "I think that in balancing the equities and looking at the testimony and its probative value, and I was looking at it in the context that we looked at it yesterday in terms of showing [plaintiff's] state of mind and with the exclusion of the police officer being able to come in and say that she made no complaints, I think that balances the equities between the parties and allows the case to go forward in a fair fashion."

We agree with the trial court's determination. Here, Cory made no claim of any injuries in the case. There was no competent opinion testimony of injuries sustained or whether such injuries had any causal relationship to the accident. Generally, the details about the nature and severity of personal injuries to nonlitigants in automobile cases are not admissible. See *Keil v. McCormick*, 5 Ill. App. 3d 523, 526 (1972); *Vujovich v. Chicago Transit Authority*, 6 Ill. App. 2d 115, 118-19 (1955) (there is wide discretion to exclude evidence for reasons of trial expediency, as where the evidence is so remotely related that its probative value is inconsequential or leads to collateral issues). Whether Cory sustained any injuries as a proximate result of the accident was a collateral issue upon which no discovery had been conducted. However, it is clear that the court did find some probative value in the fact that Cory was crying after the accident, which is why the trial court granted the motion with the condition that defendant be barred from calling the police officer to testify that plaintiff denied sustaining injuries at the scene of the accident. Under these circumstances, we cannot say that the trial court abused its discretion in barring evidence of alleged crying or injuries.

## CONCLUSION

For the foregoing reasons, we affirm the order of the circuit court of Winnebago County.

Affirmed.

GROMETER, J., concurs.

JUSTICE BOWMAN, specially concurring in part and dissenting in part:

I respectfully dissent in part.

I disagree with the majority's conclusion that the testimony of defendant's accident reconstruction expert, Mark Strauss, amounts to harmless error. The majority argues that the totality of the evidence

in this matter excluding Strauss's testimony results in a conclusion that "the jury's verdict would not have been different if Strauss had been barred from testifying." 341 Ill. App. 3d at 316. I believe the majority incorrectly assumes that, in the absence of Strauss's testimony, the outcome of the trial was certain to favor defendant.

The central issue in dispute is whether there exists a causal connection between the aggravation of plaintiff's injury, which required surgery, and the parties' car accident. In the absence of Strauss's testimony, the evidence pertinent here consists of the testimony of two expert physicians with conflicting opinions on the central issue in controversy.

Dr. Wright opined that, at the time of the May 6 MRI, plaintiff was not a surgical candidate. Then, after the accident, plaintiff reported a significant worsening of her symptoms. Upon reviewing the July 23 MRI, Wright noticed there was a dramatic worsening of the disc protrusion at the L4-L5 level.

Wright testified that there was a causal connection between the accident and the worsening of plaintiff's injury. He stated:

"[S]he was doing reasonably well and holding her own up until the time of this reported car accident. And it was only after the accident occurred that she reported the dramatic worsening of her symptomatology. That would seem to correlate well with what we saw in terms of changes in the MRI. And predicated on that history I would have to believe that it coincided with the accident."

Wright continued that, more likely than not, the worsening symptoms were a result of the car accident.

On cross-examination, as the majority notes, Wright stated that common sense would seem to dictate that a lower impact speed of the vehicles would correlate with a lower probability of injury occurring to the passengers. He also stated that based on the lack of perceivable damage to the vehicles the accident appeared to be a low-speed impact. However, Wright qualified his answer regarding the possible inferences that could be drawn from the lack of damage to the vehicle by stating that he did not know what kind of damage to expect from the accident. In addition, on redirect examination, plaintiff's counsel posed a hypothetical to Wright based on plaintiff's testimony that her car moved forward one-half to a full car length when she was hit from behind. The question asked: if plaintiff was unexpectedly thrust forward against her seat belt when the vehicle came to a rest, would that force cause the kind of trauma that was present in the July 23 MRI? Wright responded that such forward movement and then sudden snap back would probably be adequate to cause plaintiff's disc to herniate. Wright also opined that some patients who incur significant trauma may take days to experience a herniated disc.

Contrary to Wright's testimony, Dr. Delheimer testified that he believed that there was no significant difference between the May 6 MRI and the July 23 MRI. He opined that the condition of plaintiff's disc protrusion at the L4-L5 level on July 23 was basically the same as it was back in May. Based on his review of the damage to the vehicles, he found it hard to believe that the accident was a material factor in plaintiff's need for surgery or her worsening symptoms. However, on cross-examination, Delheimer admitted that he did not know what movement occurred with respect to plaintiff's body at the point of impact and immediately thereafter.

We will reverse a trial court's ruling regarding the admissibility of an expert's opinion when the error was prejudicial or the result of the trial was materially affected. See *Turner v. Williams*, 326 Ill. App. 3d 541, 553 (2001). In *Hiscott v. Peters*, 324 Ill. App. 3d 114, 123 (2001), we considered the testimony of an accident reconstruction expert. There, we held that there was no concrete factual basis to support the expert's opinion because there was insufficient physical evidence to provide him with the basic data needed to reconstruct an automobile accident. *Hiscott*, 324 Ill. App. 3d at 124. Thus, we held that the expert's opinion that hypothesized how the parties' automobile accident occurred amounted to pure speculation and could not assist the jury in understanding the evidence. *Hiscott*, 324 Ill. App. 3d at 124.

After we concluded that the court erred in admitting the opinion testimony of the reconstruction expert, we stated that the expert's testimony related directly to the central controversy of the case: how the collision took place, who was at fault, and the degree of fault assigned to the defendants. *Hiscott*, 324 Ill. App. 3d at 124. We then stated:

> "Accordingly, the admission of [the expert's] testimony cannot be said to have had no effect on the outcome of the trial. We believe that this error may have tipped the scales with regard to the jury's assignment of liability between the defendants." *Hiscott*, 324 Ill. App. 3d at 124.

Thus, we reversed and remanded the matter for a new trial. *Hiscott*, 324 Ill. App. 3d at 124.

I believe that *Hiscott* is controlling here. In a sweeping generalization, Strauss opined that, based on research in the field of biomedical engineering, a person cannot be injured in an accident in which the impacting vehicle is traveling at five to seven miles per hour. He further bolstered his conclusion by pointing to the "numerous studies and numerous tests" that supported it. Moreover, when defendant's counsel asked Strauss if the impact from the accident was "sufficient to aggravate any preexisting condition that the plaintiff had in her

back," Strauss responded, "I do not believe that this can aggravate *a preexisting condition.*" (Emphasis added.) Then, when defendant's counsel asked Strauss if the impact from the accident between the two vehicles here "would have been sufficient to cause any injury to the plaintiff in this case," in a similar manner Strauss responded, "there is no way the back is going to be injured in this type of accident." Thus, even Strauss's response to a specific question about plaintiff was laced with generality.

Strauss's testimony related directly to the central controversy in this matter: whether there exists a causal connection between the aggravation of plaintiff's injury and the accident. The evidence on this central controversy hinged on the jury's consideration of the conflicting opinions of two expert physicians and Strauss's powerful, but impermissible, testimony. The admission of Strauss's testimony cannot be said to have had no effect on the outcome of the trial. I believe that this error may have tipped the scales in defendant's favor. Thus, I cannot agree with the majority's conclusion that in the absence of the error the outcome in this matter was certain to be the same. Accordingly, I would remand this case for a new trial.