SIXTH DIVISION
November 9, 2006

No. 1-04-1622

| | | |
|---|---|---|
| MICHAEL A. WEBBER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 L 423 |
| | ) | |
| WIGHT & COMPANY, | ) | The Honorable |
| | ) | John B. Grogan, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff-appellant and cross-appellee Michael A. Webber was employed by defendant-appellee and cross-appellant Wight & Company (Wight & Co.) as its chief financial officer (CFO) from 1991 to 1999. Following his termination, Webber filed a retaliatory discharge claim, alleging that he was fired because he objected to Wight & Co.'s accounting practices, which he believed were illegal and/or improper. The cause proceeded to a jury trial, and the jury returned a verdict for Wight & Co. Wight & Co. then moved for sanctions against Webber pursuant to Supreme Court Rule 137 (155 Ill. 2d R. 137), claiming that Webber filed his complaint knowing his allegations were false. The trial court denied this motion. Webber appeals the jury's verdict, asserting that the trial court erred by refusing to grant his proposed jury instructions, by refusing to let him testify that the accounting practices in question were illegal, and by allowing certain documents into evidence. He asks that we reverse the verdict below and remand the cause for a new trial. Wight & Co., meanwhile, has filed a cross-appeal from the denial of its posttrial motion, asserting that the trial court erred in not imposing sanctions upon Webber for his violation of Rule 137. Wight & Co. asks that we reverse the denial of its motion and that Webber be ordered to pay attorney fees as a sanction. For the following reasons, we affirm both the jury's verdict and the trial court's denial of the motion for sanctions.

BACKGROUND

Wight & Co. is a privately owned architectural and engineering firm with one shareholder: Mark Wight. Webber, who is a financial consultant, had known Wight for some time and began doing

consulting work for him in November 1991. Soon thereafter, Wight, as owner of Wight & Co., hired Webber in a permanent position as CFO and, eventually, as a vice president, to assist in the company's financial situation. Webber was in charge of the accounting department and was also a member of the company's executive committee until he was terminated by Wight. A multitude of witnesses testified at trial regarding what occurred during Webber's employment.

Webber himself testified that his main concern at Wight & Co. was to review company finances. When he first began working there, he updated the company's health insurance packages, urged the issuance of timely performance reviews of employees, and put company finances in order. In 1995, there were several changes in tax laws which affected Wight & Co. Webber testified that he approached Wight about them and that Wight told Webber he did not want to, and would not, pay taxes. In an effort to ease the company's tax burden, Webber helped Wight & Co. form new companies, including TeraByte, Wight Development Corporation, and Wight Partners Limited. These were meant to take advantage of new tax structures, with Wight Partners Limited to concentrate mainly on Wight's own personal investments. Webber testified that Wight was upset at the recommendations he made to keep the company in line with tax laws. He stated that Wight wanted him to reclassify Wight & Co. expenses; that is, to make non-deductible expenses either partially or fully deductible, and to move personal expenditures made by Wight Partners Ltd. to the financial books of Wight & Co. Webber believed "it was absolutely incorrect" and improper to do this and told Wight that he refused to reclassify any expenses. Webber testified that Wight had others in the accounting department reclassify the expenses upon his refusal to do so.

Webber further testified that he approached Irwin Steinberg, an outside certified public accountant (CPA) who had done some work for Wight & Co., to clarify the deductibility of certain expenses made by the company. When Wight found out Webber had done this, he told Webber not to go outside the company ever again. Between 1996 and 1997, Wight & Co. entered into a project with the Illinois Department of Transportation (IDOT). As a prerequisite, IDOT, led by its auditor Mark Rangel, conducted an audit of Wight & Co.'s financial books; that is, an independent verification that Wight &

Co.'s financial records were fairly presented to other companies (like IDOT) seeking to do business with them. Webber and Rich Carlson, the director of Wight & Co.'s architecture department, assisted Rangel in the audit and met to discuss Rangel's findings. Webber testified that following their meeting, Carlson met with Wight, whereupon Wight reprimanded Webber about imparting confidential information about Wight & Co.'s finances to both Carlson and Rangel. Webber also testified that in early to mid-1998, as his relationship with his employer soured, he voiced his concern about disagreements he was having with Wight regarding improper codings, expenses and reporting in the financial records of Wight & Co. to Al Diebert and John Pruitt, outside consultants who sometimes worked with Wight & Co. Webber also stated that he never received a bad performance review while employed there.

On cross-examination, Webber testified that Wight never told him to do things "his [Wight's] way" or he would be "fired." He admitted that he was upset because he believed Wight & Co. should have distributed more profits to him and other members of the executive committee than those they were receiving; Webber testified that Wight had once mentioned a phantom stock or bonus plan which would have given the executive committee members a chance to obtain company stock, but never implemented it. Though Webber stated he did not want more money but, rather, more partners in the company so there would be more scrutiny of the financial records, he did state that he "had been looking forward" to the plan and found the whole situation "frustrating" when Wight failed to implement it. He further admitted that he was "resentful" of Wight as Wight began to tell others that he and Webber were having "communication problems." Regarding the IDOT audit, Webber admitted that he did impart Wight & Co. confidential financial information to Carlson and Rangel that he should not have been talking about, but that he did so in an effort "to save" Wight & Co. from tax problems. Webber testified that he never told any independent auditors that what was happening at Wight & Co. was improper, and admitted that he signed several management representation letters in his capacity as CFO of Wight & Co., pursuant to his responsibility to fairly present the company's financial situation to outside auditors. Four of these letters, which were provided to Wolf & Company (Wolf), a CPA firm working with Wight & Co. and which had

also been signed by Wight, were admitted into evidence over Webber's objection. The letters stated the following: that Wight & Co. was "in conformity with generally accepted accounting principles," that all material transactions were "properly reflected" in the company's financial statements, and that there were "no violations or potential violations" of tax laws and regulations by Wight & Co. Though Webber stated that he may not have read these form letters before signing them, he knew at the time they would be used by auditors from several companies looking to do business with Wight & Co. as a reflection of its financial condition.

Rangel testified that, while doing the audit of Wight & Co. for IDOT, he found some unallowable costs the company sought reimbursement for from the federal government, such as personal expenses, gifts and large salaries, so he disallowed them. He then had meetings with Webber, as well as Carlson, during which Webber "lobbied" for these disallowed expenses on behalf of Wight & Co. Rangel further testified that every expense made by Wight & Co. was accounted for in the records kept by Webber and his department.

John DeLand, a partner at Wolf, testified that he was in charge of an audit Wolf performed of Wight & Co., and also helped prepare Wight & Co.'s tax returns and reviewed its financial statements from time to time; he worked with Webber on these tasks. He explained that a management representation letter is written at the end of an audit and is the company's representation to an auditor that its financial statements are fairly presented and that the company's management has authenticated its responsibility for the information contained in the financial statements. He further explained that an auditor cannot sign off on an audit without this letter. He testified that the four management representation letters in evidence in this case, dated from 1996 through 1998 and reviewing company financial records from 1995 through 1997, were provided to him as the auditor by Webber as Wight & Co.'s CFO. Webber's signature confirmed that there has been no fraudulent financial reporting, no noncompliance with financial requirements, and no improper recordings by Wight & Co. during these years. DeLand further testified that Webber never disclosed anything to him regarding Wight & Co.'s

financial practices contrary to these representations.

Several other witnesses testified on Webber's behalf, including Steinberg and Gail Duffy, who worked with Webber in Wight & Co.'s accounting department. Their testimony indicated that Webber had made good changes in Wight & Co.'s accounting practices when he arrived at the company.

Mark Wight admitted that Webber implemented programs, developed new reports, resolved problems in the accounting department, and improved Wight & Co.'s financial recording situation upon his employment. However, he also testified that he did not fire Webber because Webber complained about Wight & Co.'s expense issues or because Webber may have believed "improper" accounting practices were taking place in his department upon Wight's authority. Wight stated that, in fact, Webber never refused to sign any company tax returns, and Wight could not recall any time when Webber refused to do something with the company ledgers because he did not agree with it. Though Wight did "put pressure" on Webber to find classifications that were deductible to ease Wight & Co.'s tax burden, he testified that he told Webber to do this only "if it was appropriate," he did not remember any instance where Webber complained, and by 2000 all loans made by and among Wight's companies had been repaid.

Wight further testified that he fired Webber because he simply gave up on him. Wight stated that Webber had been "on the bubble" of termination for years before it occurred because Wight & Co.'s senior management team had been unhappy with Webber's performance and because several outside consultants had recommended Webber's termination. Wight testified that, in addition to this "very critical" feedback he was receiving, he and Webber had begun to experience poor communication issues in their professional capacities; Webber argued with Wight that Wight's salary was too high, constantly complained that his own salary was too low, and became "divisive." Wight also stated that Webber was spending his time doing "completely irrelevant" work, that they did not see eye-to-eye on major company issues, and, most importantly, that Webber had begun disclosing confidential company information to outsiders, who had reported back to Wight. Wight further testified that, based on Webber's slipping job

5

performance, his higher salary demands and his information leaks, Wight & Co. decided to go in a "different direction" and fired Webber in favor of hiring Martha Adams as its new CFO.

Joe Ferreri, Wight & Co.'s chief operating officer during Webber's employment, testified that he had talked often with Wight over the years about firing Webber due to his personality and job performance. Ferreri testified that he sought Webber's termination as early as 1994 following a performance review he conducted of Webber's work, wherein he noted several areas needing improvement, including keeping confidential information confidential and managing the accounting department. Regarding Webber's personality, Ferreri testified that Webber did not manage the accounting department or staff effectively. He stated that several members of the accounting staff were critical of Webber, even threatening to quit if he remained in charge of the department. Ferreri testified that Webber would complain to him that Wight "usurped his [Webber's] authority" regarding company finances, and that Webber constantly raised issue with his salary and felt he was not being paid enough for his work. Regarding his job performance, Ferreri noted that Webber's financial reports did not use an appropriate format, which oftentimes resulted in convoluted and complicated company reports that required further deciphering; Ferreri stated that when Webber was asked to simplify these reports, he would blame others in the department. Ferreri also commented that Webber left confidential personnel files laying around, and approached him as well as others in an effort to disclose confidential company information, specifically, the amount of Wight's personal expenses and salary, and Webber's own frustration regarding these.

John Pruitt, a CPA and financial consultant hired by Wight & Co., testified that he often had to work with Webber while reviewing Webber's reports and Wight & Co.'s tax returns, financial plans and audits. He stated that Webber often did not use the most current or specific information in preparing company reports, which exhibited a decrease in his competency as CFO. Pruitt noted that some of the internal documents Webber prepared for Wight & Co. did not support each other. Pruitt attended a presentation Webber gave regarding Wight & Co. finances, which Pruitt found to be overly detailed and

misdirected. Webber appeared to Pruitt to be "combative," not on the "same page with the company," and unsupportive of company leadership, particularly in front of others. Pruitt stated that he discussed this personally with Webber at a company retreat and that Webber acknowledged there were problems. Pruitt further testified that he recommended to both Wight and Ferreri that Webber be terminated due to his differences with company leadership.

Several other witnesses testified on behalf of Wight & Co. Adams, Wight & Co.'s current CFO, testified that, upon assuming Webber's position, she found the company's accounting system to be "in very bad shape." She stated that the accounting department was "being run relatively inefficiently," following "very cumbersome and outdated" systems. She noted that the department was still using old versions of computer software and programs, or sometimes none at all and instead relying on manual input; this resulted in redundant data, inconsistent or "corrupt" results, and system balances that were not in balance. Adams further testified that when she started, she found Webber's system to be "very old-fashioned" rather than streamlined or efficient. Clifford Bedar, a former member of Wight & Co.'s executive committee, testified that while Webber had greatly improved the company's financial reporting system when he began working there, he heard Wight complain about Webber's job performance, particularly that Webber had leaked confidential information. Bedar also testified that he never heard Webber say that Wight & Co.'s recording practices were improper and indicated that Webber had been a big proponent of the proposed stock-sharing plan that Wight failed to implement. Mary Diebert, an outside consultant who worked with Webber on Wight & Co. accounts, testified that she found Webber to be very abrupt and "gruff" when interacting with other employees. She stated that Webber also failed to show up to the management training meetings she held for Wight & Co.'s accounting department. Diebert further testified that the "friction" present in the accounting department due to Webber's behavior was particular only to that department of Wight & Co. and that she recommended to potential hires not to apply for a job there. Finally, Carlson testified that he once met with Webber and that Webber began discussing with him company information regarding Wight's personal expenses and salary; Carlson told

Wight about this meeting. Carlson also testified that he witnessed communication problems between Webber and Wight by late 1998. He stated that he offered to mediate and told Webber that he needed to change or else his job would be in danger; yet, he did not see any changes in Webber's behavior. He further testified that no one at Wight & Co. was surprised when Webber was terminated.

Following the close of testimony at trial, the jury returned a verdict in favor of Wight & Co. and against Webber on his retaliatory discharge claim. Wight & Co. filed a posttrial motion for sanctions pursuant to Rule 137, alleging that Webber intentionally filed a frivolous suit without any basis in law. Particularly, Wight & Co. argued that the management representation letters presented at trial which Webber had signed years ago as CFO confirming that the company had not violated any tax laws disproved the core allegations of his more recent complaint that Wight & Co. had fired him because he protested such violations. The trial court denied Wight & Co.'s motion, finding that Webber had stated a claim with fact questions and, though the jury resolved them in favor or Wight & Co., there was no sanctionable conduct on the part of Webber in filing his complaint.

## ANALYSIS

### I. Webber's Appeal

Webber contends on appeal that the trial court committed reversible error in three respects: by refusing to grant his proposed jury instructions, by refusing to let him testify that he would not make the entries in ledgers as ordered by Wight & Co. because they were "illegal," and by improperly allowing Wight & Co. to surprise him at trial with documents, namely, the management representation letters, subpoenaed prior to trial but not given to him before he was examined regarding them. Wight & Co., meanwhile, claims that Webber has waived each of these issues on appeal and, regardless, that the trial court's rulings were proper. We will examine each of Webber's contentions separately.

### A. Jury Instructions

Webber's first contention is that the trial court erred by refusing to grant his proposed jury instructions Numbers 1 and 2. As provided in his brief on appeal, the proposed instructions were as

8

follows:

"Illinois' interest in enforcing federal tax laws is sufficient to sustain a retaliatory discharge claim by an employee";

and:

"A claim for retaliatory discharge is established where the plaintiff shows:

1. That he was employed by the defendant before he complained that the defendant was violating standard accounting procedures which require full disclosure, truthfulness and accuracy in financial reports made by business [*sic*] to the government and the public and that defendant was violating the federal tax laws, and

2. That he made those claims internally."

As a threshold matter, Wight & Co. alleges that Webber has waived any claim regarding jury instructions on appeal because he did not properly preserve it in a posttrial motion. Wight & Co. points out that Webber did not include his proposed instructions in his motion, nor did he specify the factual or legal basis for his allegation that the trial court erred in not giving them. In further support of its argument of waiver, Wight & Co. notes that Webber has failed to include a copy of the jury instruction conference transcript in the record on appeal. Based on our review of the record, we must agree with Wight & Co. that Webber has forfeited this issue for our review.

Section 2-1202(b) of the Illinois Code of Civil Procedure mandates that a posttrial motion contain the points relied upon, "particularly specifying the grounds in support thereof." 735 ILCS 5/2-1202(b) (West 2002). Our state supreme court has reenforced this requirement by declaring that a party "may not urge as error on review of the ruling on his post-trial motion any point, ground, or relief not specified in the motion." 155 Ill. 2d R. 366(b)(2)(iii). In the context of an allegation regarding the giving or failure to give a jury instruction, these principles work in conjunction with another that further limits the scope of appeals, *i.e.*, that the injured party must provide the reviewing court with the content of the instruction

9

conference on appeal. See 166 Ill. 2d R. 323(a) (report of proceedings must include all evidence pertinent to the issue on appeal).

Brown v. Decatur Memorial Hospital, 83 Ill. 2d 344 (1980), is dispositive on the issue at hand and clearly ties these posttrial motion specificity rules together. See Hampton v. Sears Roebuck & Co., 252 Ill. App. 3d 744, 753 (1993) (noting that Brown is "clearly in point" on the issue of posttrial motion specificity in the context of jury instructions issues); Schultz v. Republic Insurance Co., 124 Ill. App. 3d 342, 343 (1984) (commenting that Brown is "dispositive" in this context). In Brown, a patient brought a negligence action against a hospital for injuries. Judgment was entered for the hospital, the patient appealed, and the appellate court affirmed. Upon further consideration, our state supreme court concluded that the patient's posttrial motion, which contained an allegation of error concerning jury instructions, was not sufficiently specific to preserve that issue for review. See Brown, 83 Ill. 2d at 348. The Brown court's reasoning proves very instructive. It began by noting the threefold purpose of the general posttrial motion specificity rules outlined above: they allow the trial court, which is most familiar with the trial, to review its decisions "without the pressure of an ongoing trial"; they allow a reviewing court to ascertain from the record whether the trial court has been afforded an opportunity to reassess its ruling in question; and they "prevent[] [litigants] from stating mere general objections and subsequently raising on appeal arguments which the trial judge was never given an opportunity to consider." Brown, 83 Ill. 2d at 349-50; see also Hampton, 252 Ill. App. 3d at 752-53; Schultz, 124 Ill. App. 3d at 344. In essence, the Brown court declared that a trial court, through the posttrial motion, must be adequately apprised of the grounds of the litigant's contentions of error; while a "voluminous" posttrial motion is not required, there must be, at the very least, a "simple, succinct statement of the factual or legal basis" for the litigant's belief that the trial court erred. Brown, 83 Ill. 2d at 350; accord Hampton, 252 Ill. App. 3d at 752-53 (these are the "bare requirements of a sufficient" posttrial motion); Schultz, 124 Ill. App. 3d 344.

In addition to these general posttrial motion specificity rules, the Brown court noted that there is one more step regarding specificity within the context of appeals from decisions involving jury

instructions. See Brown, 83 Ill. 2d at 350. The court commented that in such instances, the posttrial

motion specificity rules further require that the litigant provide the reviewing court with a transcript of the

jury instruction conference establishing that the argument he advances on appeal was advanced in the trial

court below; without this, the litigant "is barred from raising" the jury instruction issue in the reviewing

court. Brown, 83 Ill. 2d at 350; see, *e.g.*, Schultz, 124 Ill. App. 3d at 344-45. Again, this prevents a

litigant from raising issues on appeal which he did not present to the trial court. See Brown, 83 Ill. 2d at

350; accord Schultz, 124 Ill. App. 3d at 344.

Reviewing the facts of the case before it, the Brown court held that the patient did not comply

with these posttrial motion rules, as he never provided the trial court anything other than a motion stating

that certain jury instructions were erroneously given while others were erroneously omitted, nor did he

provide a record indicating that he had apprised the trial court of his specific arguments regarding the

instructions. See Brown, 83 Ill. 2d at 351-53. Thus, he had forfeited this issue. See Brown, 83 Ill. 2d at

353.

In the instant case, as in Brown, Webber has failed to satisfy the posttrial motion specificity rules.

Of the nine points of error cited by Webber in his motion, only one addresses the jury instruction issue he

now raises before us:

> "The judge gave the wrong jury instructions on wrongful discharge and did not permit
>
> instructions that would have allowed plaintiff to allege that he did not have to report the
>
> acts of misconduct to authorities, that he could complain internally and that it is public
>
> policy to have good and accurate accounting books and records."

First, while this statement in his posttrial motion alludes to the underlying crux of the jury instructions he

proposed at trial, it does not track the same language or even the same concepts. For example, while his

proposed instructions mention "Illinois' interest" in federal tax laws, and state the (alleged) elements for a

retaliatory discharge claim, his statement in his posttrial motion mentions nothing about these and

provides, rather, other elements, such as that "he did not have to report the acts of misconduct to

authorities."  In short, Webber failed to state the proposed instructions he sought at trial.  *Cf.* Brown, 83 Ill. 2d at 352; Schultz, 124 Ill. App. 3d at 344; Hampton, 252 Ill. App. 3d at 752 (while inclusion of instructions verbatim in posttrial motion is not, alone, sufficient for the specificity requirement without an accompanying factual or legal basis, this may be a factor).

More significantly, however, is that Webber's statement in his posttrial motion does not specify why, factually or legally, it was reversible error for the trial court to refuse his proposed instructions.  He asserts merely that the trial court "gave the wrong instruction"; there is no indication as to the grounds for the allegation of error.  Thus, the trial court was not afforded the opportunity provided by the posttrial motion specificity rules to reconsider its earlier rulings and, accordingly, the issue must be deemed waived.  While this may seem a harsh formality, our supreme court made clear in Brown that all that was required of Webber was to provide a short, simple statement of the factual or legal basis for his belief that the trial court erred.  See Brown, 83 Ill. 2d at 350; accord Schultz, 124 Ill. App. 3d at 344 (these rules were designed to promote judicial economy and avoid unnecessary appeals, and are not just formalities). He did not provide even this.[1]

---

[1]We note that the record contains both the instructions given to the jury at trial and Webber's proposed instructions at issue here.  Though we discuss this in further detail below, we acknowledge that

at the bottom of Webber's proposed instructions, a series of cases is cited. However, Webber did not cite even one of these cases in his posttrial motion concerning his jury instruction allegation of error. While perhaps he would have met the posttrial motion specificity rules by doing so (*i.e.*, this could have been considered a sufficient "legal basis" to preserve his contention), we will not speculate in that regard, particularly because Webber did not make this argument in his brief on appeal. We only mention the presence of these cited cases to provide an accurate record for our decision here.

In addition, we would be remiss if we did not note one final and important factor that supports the resulting waiver of Webber's jury instruction issue: the lack of a transcript of the jury instruction conference. Plainly put, Webber did not provide us with this. Upon our thorough review of the lengthy record in this cause, all we were able to find were the actual jury instructions given at trial and those proposed by Webber, with the trial court's final indication of which instructions were given and which were denied. In fact, the only support Webber cites in his brief on appeal regarding the jury instruction conference are these pages in the record. We cannot, from these pages alone, ascertain whether the specific contentions Webber argues before us on review regarding the jury instructions were ever presented to the trial court.[2] As we discussed above, this is critical, as arguments may not be raised for the first time on appeal. See Brown, 83 Ill. 2d at 351; Schultz, 124 Ill. App. 3d at 344; see also Corral v. Mervis Industries, Inc., 217 Ill. 2d 144, 156 (2005), citing Webster v. Hartman, 195 Ill. 2d 426, 432 (2001) (where issue on review relates to what occurred at proceeding, issue is not subject to review absent report or record of that proceeding).

Without specific grounds set forth in the posttrial motion, and in the absence of any material in the record from which we could ascertain the content of the jury instruction conference, Webber has left us with nothing to indicate that the trial court was apprised of his jury instruction contentions and had the opportunity to reassess its ruling below, or that he is not simply raising on appeal an argument that he never raised below. Accordingly, we conclude that Webber's posttrial motion was not sufficiently

---

[2]While there are instances among these pages that show that the trial court noted when jury instructions were given over a party's objection, there is no such note by the court, or anyone, regarding the jury instructions on retaliatory discharge given in place of those proposed by Webber here. This leaves us further wondering, apart from the posttrial motion concerns, whether Webber even raised a trial objection in an effort to preserve the issue for our review.

specific to preserve this issue and we deem it waived. See <u>Brown</u>, 83 Ill. 2d at 351-53; <u>Schultz</u>, 124 Ill. App. 3d at 344-45 (the plaintiff's posttrial motion which merely asserted trial court error in refusing to give jury instruction and included instruction verbatim but did not indicate ground for error, along with the plaintiff's failure to include content of jury instruction conference, resulted in waiver of issue); see also <u>Hampton</u>, 252 Ill. App. 3d at 752-53 (where the plaintiff's posttrial motion citing jury instruction error listed only the instructions at issue but did not specify the grounds upon which the allegations of error were based, posttrial motion held to be insufficiently specific to preserve issue for review); see, *e.g.*, <u>Wagner v. City of Chicago</u>, 254 Ill. App. 3d 842, 852 (1993) (posttrial motion stating only that trial court "improperly instructed the jury" was without specificity and resulted in waiver of issue for review).

Even were we to come to the opposite conclusion (see <u>Blake v. Tri-State Crane Service, Inc.</u>, 114 Ill. App. 3d 1059, 1064 (1983) (opining that, based on particular facts, the posttrial motion setting forth a jury instruction issue was sufficiently specific to meet the requirements)), or choose to ignore waiver and substantively review his jury instruction issue (see <u>Daniels v. Industrial Comm'n</u>, 201 Ill. 2d 160, 172 (2002) (relaxing waiver rule since it does not limit appellate jurisdiction)), we would disagree with Webber's assertion of trial court error, as there is no merit to his argument that the jury was misinformed about the definition of retaliatory discharge or that he suffered prejudice because of it.

Whether to provide a particular jury instruction lies within the sound discretion of the trial court, and we, as the reviewing court, will not disturb that determination absent a clear abuse of discretion.[3] See <u>Schultz v. Northeast Illinois Regional Commuter R.R. Corp.</u>, 201 Ill. 2d 260, 273 (2002); accord <u>Stift v.</u>

---

[3]While stating in his opening brief on appeal that the standard of review for the refusal to give jury instructions is abuse of discretion, Webber shifts gears in his reply brief to assert that the standard should be *de novo* because the trial court here "kept ruling incorrectly as a matter of law." Based on the voluminous amount of precedent establishing an abuse of discretion standard here (some of which we have just cited), we decline to accept Webber's new proposition.

Lizzadro, 362 Ill. App. 3d 1019, 1025-26 (2005); see, *e.g.*, York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147 (2006). Thus, it is for the trial court to evaluate if a jury instruction is "applicable, supported by evidence in the record, and an accurate statement of the law." Luye v. Schopper, 348 Ill. App. 3d 767, 773 (2004); see also Schultz, 124 Ill. App. 3d at 345 (function of jury instructions is "to convey to the jury the correct principles of law applicable to the evidence submitted to them"). It is true that litigants are entitled to have the jury instructed as to their theory of the case; however, the instructions they propose "must accurately state applicable law" in order for them to be given at trial. Schultz, 124 Ill. App. 3d at 345-46. Ultimately, there is no abuse of discretion as long as, "taken as a whole, the instructions [given at trial] fairly, fully, and comprehensively apprise[] the jury of the relevant legal principles" of the case presented. Northeast Illinois Regional, 201 Ill. 2d at 273-74. A new trial will be granted based on the court's refusal to give a proposed instruction only when that refusal has caused serious prejudice to a litigant's right to a fair trial. See Stift, 362 Ill. App. 3d at 1026, citing Linn v. Damilano, 303 Ill. App. 3d 600, 606-07 (1999).

The elements for a retaliatory discharge cause of action are that a litigant (1) has been discharged; (2) in retaliation for his activities; and (3) the discharge violates a clear mandate of public policy. See Krum v. Chicago National League Ball Club, Inc., 365 Ill. App. 3d 785, 788 (2006); accord Vorpagel v. Maxell Corp. of America, 333 Ill. App. 3d 51, 54 (2002); see also Zimmerman v. Buchheit of Sparta, Inc., 164 Ill. 2d 29, 35 (1994) (a valid claim for retaliatory discharge exists only if these three elements are alleged). The key here is that there is a causal relationship among these elements. See Vorpagel, 333 Ill. App. 3d at 56; Paz v. Commonwealth Edison, 314 Ill. App. 3d 591, 594 (2000) (there is a "causation element" for a claim of retaliatory discharge). That is, the litigant's cause of action for retaliatory discharge hinges on evidence of a causal connection between his activities as an employee and his discharge. See Dixon Distributing Co. v. Hanover Insurance Co., 161 Ill. 2d 433, 444 (1994); accord Paz, 314 Ill. App. 3d at 594 (discharge must be causally related to act); see also Jacobson v. Knepper & Moga, P.C., 185 Ill. 2d 372, 376 (1998) (to succeed on retaliatory discharge claim, litigant must show he was

discharged *in retaliation for* his activities). Without this, the cause of action fails.

In the instant case, the tendered instructions proposed by Webber at trial set forth an erroneous standard with regard to retaliatory discharge because they omit the required causation element. As set forth earlier, Webber's proposed instruction Number 1 states that "Illinois' interest" in enforcing federal tax laws is sufficient to sustain a retaliatory discharge claim, and his proposed instruction Number 2 states that a claim for retaliatory discharge is established once he shows that he was employed by Wight & Co. "before he complained that [Wight & Co.] was violating" accounting procedures requiring full disclosure to the government, that Wight & Co. "was violating federal tax laws," and that Webber "made those claims internally." Upon examination, however, it is clear that nothing in either of Webber's proposed instructions indicates that he was required to show that he was discharged *in retaliation for* making his complaints. Instead, Webber focuses only on two of the three elements of a retaliatory discharge claim: that he was discharged (though not even this is ever explicitly stated), and that (as he claims) there is public policy surrounding Illinois' interest in enforcing federal tax laws. He leaves out any indication of the causal link between his discharge and his complaints that is necessary to sustain, or even plead, a cause of action for retaliatory discharge. Webber's proposed jury instructions did not accurately state applicable law in this case and, therefore, would not have been appropriate.

What is more, we find that the instructions given by the trial court to the jury regarding retaliatory discharge were not "wrong," erroneous or prejudicial, as Webber asserts, but, rather, were entirely proper. Jury instruction Number 6, which the record indicates was given at trial, states:

> "To prevail on his retaliatory discharge claim, plaintiff Michael Webber must prove each
> of the following elements:
>
>> 1. That defendant Wight & Company terminated his employment;
>> 2. That he engaged in activity protected by a clearly mandated public policy; and
>> 3. That defendant terminated his employment in retaliation for his alleged
>> protected activity."

17

When compared to the elements of a retaliatory discharged claim we just discussed, it is undeniable that this given instruction, in contrast to Webber's proffered ones, is an accurate statement of the correct law applicable to this case which "fairly, fully, and comprehensively apprised the jury" of the relevant legal principles at play here. See Luye, 348 Ill. App. 3d at 773; Northeast Illinois Regional, 201 Ill. 2d at 273-74.

Accordingly, because Webber's proposed jury instructions were erroneous due to his failure to include the causation element of retaliatory discharge, we find that the trial court's refusal to give his instructions was proper and not an abuse of discretion. See Schultz, 124 Ill. App. 3d at 345-46 (no abuse in refusal to give proposed instruction where it set forth an erroneous standard of proof regarding the cause of action at hand).

### B. Testimony of "Illegality"

Webber's second contention on appeal is that the trial court committed reversible error when it refused to allow him to testify that he would not make the accounting entries he was directed to by Wight & Co. because they were "illegal." Webber asserts that this was the "basis of his claim" and the court's prohibition of this testimony was not only contrary to the law of retaliatory discharge, but also prevented him from proving his case.

As a threshold matter, Wight & Co. again alleges that Webber has waived this claim because he did not properly preserve it. Wight & Co. revisits Webber's posttrial motion, asserting that he did not specify the factual or legal basis for his allegation.

The only statement Webber makes regarding this issue in his posttrial motion is:

> "The judge would not allow the plaintiff to testify that the acts complained of violated the tax laws."

We again must agree with Wight & Co. that Webber has forfeited this issue for our review. The posttrial motion specificity rules announced by our supreme court in Brown are "not limited to questions concerning jury instructions." Brown, 83 Ill. 2d at 350. Rather, they are general requirements applicable

18

to any issue presented on review. See, *e.g.*, <u>Dupree v. County of Cook</u>, 287 Ill. App. 3d 135, 144 (1997) (citing <u>Brown</u> and holding that allegation that trial court erroneously denied mistrial motion based on improper opening statement remarks was waived because posttrial motion "was not sufficiently specific to preserve the issue"); <u>Moore v. Streit</u>, 181 Ill. App. 3d 587, 599 (1989) (citing <u>Brown</u> and deeming that issues raised, including alleged error regarding admission of documents at trial, were waived "because [party] failed to specifically raise them in *** post-trial motion"); <u>La Bree v. Schrieber Co.</u>, 116 Ill. App. 3d 15, 18 (1983) (citing <u>Brown</u> and noting that issue surrounding failure of jury to complete special interrogatory regarding allocation of percentage of fault was waived because posttrial motion was "lacking in specificity"). Webber's statement in his posttrial motion, though indicating what he is protesting, provides no factual or legal basis for his allegation of testimonial error. Reviewing the rules outlined in <u>Brown</u>, we conclude that Webber's posttrial motion simply does not meet the specificity requirements for the proper preservation of this issue, and it is waived.

Even were we to ignore waiver and substantively review this issue (see <u>Daniels</u>, 201 Ill. 2d at 172), we would again disagree with Webber's assertion of error, finding that there is no merit to his argument that he was prevented from pleading the "basis of his claim" because the court prohibited him testifying that Wight & Co.'s activities were "illegal."

The decision whether to allow or exclude evidence at trial, including testimony, lies with the sound discretion of the trial court. See <u>Swick v. Liautaud</u>, 169 Ill. 2d 504, 521 (1996). The court has discretion to bar testimony, and this is proper when the testimony is not sufficiently relevant or reliable to be admitted into evidence. See <u>Decker v. Libell</u>, 193 Ill. 2d 250, 254 (2000). The court's discretion is broad and inherent, and its decision in such an instance will not be overturned unless no reasonable person would take the view adopted by it. See <u>Martin v. Sally</u>, 341 Ill. App. 3d 308, 314 (2003); <u>Hallowell v. University of Chicago Hospital</u>, 334 Ill. App. 3d 206, 210 (2002).

It is well established that retaliatory discharge claims are allowed in one of two settings: the first is when a plaintiff is discharged for filing, or in anticipation of filing, a worker's compensation claim; the

second--and the setting relevant to the instant case--is when a plaintiff is discharged in retaliation for reporting the employer's conduct. See Jacobson, 185 Ill. 2d at 376; accord Geary v. Telular Corp., 341 Ill. App. 3d 694, 701 (2003). More specifically, in this second setting, the complained-of conduct can either be conduct that is illegal or conduct that is in contravention of a clearly mandated public policy but not necessarily a law. See Jacobson, 185 Ill. 2d at 376 (the conduct complained of by the plaintiff asserting a retaliatory discharge claim can be either "illegal or improper"); Stebbings v. University of Chicago, 312 Ill. App. 3d 360, 369 (2000). Accordingly, then, a plaintiff can succeed on a retaliatory discharge claim by showing that the employer's conduct was improper, yet not necessarily illegal. See Stebbings, 312 Ill. App. 3d at 369 (even though reported conduct does not amount to criminal act, retaliatory discharge claim may stand); see also Mackie v. Vaughan Chapter-Paralyzed Veterans of America, Inc., 354 Ill. App. 3d 731, 736 (2004). And, if he does choose to assert that the conduct was illegal, the plaintiff need only show that he had a good-faith belief that said conduct was illegal, not that it was in fact so. See Stebbings, 312 Ill. App. 3d at 371 (the plaintiff does not need to conclusively prove that the employer broke a law or regulation, but only have a good-faith belief to that effect); accord Mackie, 354 Il. App. 3d at 740-41 (required determination was whether the plaintiff alleged that the employer engaged in conduct the plaintiff believed in good faith was prohibited by the law); see Johnson v. World Color Press, Inc., 147 Ill. App. 3d 746, 750-54 (1986) (cause for retaliatory discharge can stand where the plaintiff asserts he reasonably believed that the employer's accounting practices violate policy).

In the instant case, Webber cites in his brief on appeal, and we confirm in the record, those sidebars where objections were raised at trial regarding his testimony. Essentially, Wight & Co. objected to Webber's proposed testimony that the conduct he complained of--namely, that Wight & Co. was shifting expenditures to other companies and declaring nondeductible items deductible--was illegal according to state and federal tax laws. In light of these arguments, the trial court consistently noted that the focus was to be on the retaliatory discharge claim, *i.e.*, whether Webber was fired because he complained about Wight & Co.'s conduct (whatever it was), not on whether the conduct was illegal *per*

*se*. Further acknowledging that no evidence was ever presented in the cause even postulating that Wight & Co. was investigated or indicted for illegal conduct, and pointing out that Webber was not a member of the Internal Revenue Service, the court prohibited him from testifying that the conduct was illegal; to allow this, concluded the court, would give Webber's baseless opinion "the imprimatur of law" before the jury, which would be particularly improper on a "side issue[] that ha[s] no bearing on," and was "not material" to, the case. Instead, the court clarified that Webber would be permitted to testify as to his "opinions that [Wight & Co.'s conduct] might be a violation." Indeed, Webber's testimony was replete with statements indicating that he believed Wight & Co.'s conduct was "absolutely incorrect," "wrong," "very improper," and "not appropriate"; he also testified via lengthy, detailed explanations supported by trial exhibits pinpointing exactly which transactions led him to form this belief. He further testified that he "would not do" what he was asked (*i.e.*, record the shifts in company ledgers) because of his opinion of impropriety.

Contrary to Webber's contention on appeal, the trial court's decision to prohibit him from testifying that Wight & Co.'s conduct was "illegal" was not contrary to the law of retaliatory discharge nor did it prevent him from proving his case. As we noted above, Webber was not required to prove, or even allege, that the Wight & Co. conduct he complained of was illegal. Rather, he could have succeeded on his retaliatory discharge claim by showing that Wight & Co.'s conduct was improper--not necessarily illegal. This is precisely what the trial court allowed and what the jury heard, as Webber testified, with the aid of exhibits no less, to numerous detailed instances which he believed showed that Wight & Co.'s accounting practices were improper. Webber's assertion that illegality and impropriety are "a far cry different" does not hold water; either avenue equally forms a viable basis for a retaliatory discharge claim, and the trial court here allowed Webber to sufficiently argue his case in his testimony.

Moreover, even if Webber continued to pursue the illegality avenue of a retaliatory discharge claim, further review provides added support for our conclusion that the trial court did not abuse its discretion in this instance. At trial, Webber sought to testify that Wight & Co.'s conduct was illegal--not

21

that he believed it to be illegal, but that it was definitely so; he did not want to simply testify that he had a reasonable or good-faith basis for his allegation, which would have otherwise provided a viable claim for retaliatory discharge. The danger here is that there was no evidence admitted at trial--documentary or testimonial, introduced by Webber or anyone else--to indicate that Wight & Co. had ever been investigated, let alone charged or indicted, regarding the accounting practices Webber cited. In fact, there was evidence presented, as found in the management representation letters presented at trial, that Webber himself had certified to outside agencies that Wight & Co. had not violated or even potentially violated federal or state tax laws. Therefore, testimony from Webber stating that what Wight & Co. was doing was "illegal" would not have been sufficiently relevant or reliable evidence which would have been admissible here.

Accordingly, in light of the record before us and based on the particular circumstances presented in this case, we find that the trial court properly exercised its discretion to exclude Webber's proposed testimony that Wight & Co.'s accounting practices were "illegal."

### C. Management Representation Letters

Webber's third and final contention on appeal is that the trial court permitted Wight & Co. to "surprise" him with documents subpoenaed prior to trial but not tendered to him before he was examined regarding them during his testimony. The documents Webber refers to are the four management representation letters admitted into evidence, which he had signed in his capacity as CFO of Wight & Co. and had provided to the CPA firm Wolf regarding four audits Wolf conducted of the company in the years between 1996 and 2000. As we noted earlier, the letters represented that Wight & Co. had conformed to generally accepted accounting principles, had prepared financial statements properly reflecting all material transactions, and had not violated any tax laws or regulations. Wight & Co. subpoenaed the letters from Wolf in preparation for trial, received them prior to trial, but did not give Webber a copy of them. Webber asserts that these actions, in combination with the trial court's admission of them into evidence while only allowing for a trial recess so Webber could discuss them with his

counsel, resulted in substantial prejudice to him because Wight & Co. was able to use the letters to claim Webber approved of the accounting practices to which he insists he objected.

Once again, as a threshold matter, Wight & Co. alleges that Webber has waived this argument for our review because he failed to properly preserve it in his posttrial motion. In that motion, Webber states, regarding the letters, only that:

> "The judge allowed the defendant to introduced signed letters to Wolf & Co[.] that had never been turned over before, even though the defendant had copies of the letters in advance of the trial through subpoena."

As Wight & Co. points out, Webber again fails to provide a factual or legal basis for this allegation. Based on our earlier discussion of <u>Brown</u> and the posttrial motion specificity rules, we must again agree with Wight & Co. that Webber's failure in this regard renders the current issue waived. See, *e.g.*, <u>Moore</u>, 181 Ill. App. 3d at 599 (issue raised citing error in admission of documents at trial deemed waived as not properly preserved because not specifically raised in posttrial motion).

Moreover, we note that Webber further failed to properly preserve this issue for another reason. In addition to filing a written posttrial motion specifying the alleged error, a party must also object at trial. See <u>Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.</u>, 342 Ill. App. 3d 150, 159 (2003) (in order to preserve issue for review, party must both object at trial and in written posttrial motion); accord <u>Morgan v. Richardson</u>, 343 Ill. App. 3d 733, 742 (2003) (failure to both object at trial and raise issue in posttrial motion forfeits it on appeal). The record in the instant case reflects that while Webber initially objected to the admission of the first letter sought to be admitted into evidence, he withdrew that objection following a sidebar and stated in open court that he had "no objection" to its admission. Then, as each of the next three letters was offered and introduced into evidence, Webber repeatedly stated each time that he had "no objection" to its admission (second and third letters), or never said anything at all (fourth letter). He cannot now be heard to complain about this. Accordingly, he has forfeited the issue for review.

Even ignoring waiver and instead substantively reviewing this issue (see Daniels, 201 Ill. 2d at 172), we find no merit in Webber's claim that he was prejudiced by the trial court's admission of the letters so as to warrant a reversal of the jury's verdict and a new trial.

As we noted earlier, the decision whether to allow evidence at trial lies within the sound discretion of the trial court (see Swick, 169 Ill. 2d at 521), and will not be overturned unless there is an abuse of that discretion so that no reasonable person would agree with the trial court's determination (see Martin, 341 Ill. App. 3d at 314). See also Brax v. Kennedy, 363 Ill. App. 3d 343, 355 (2005) (discussing standard of review regarding trial court's admission of evidence). Relevant evidence, which tends to prove a fact in controversy or renders a matter at issue more or less probable, is generally admissible. See Bachman v. General Motors Corp., 332 Ill. App. 3d 760, 797 (2002).

As Wight & Co. cross-examined Webber about whether he was upset at the failed stock-sharing plan and whether he had ever told anyone, particularly at Wolf, which prepared Wight & Co.'s tax returns, that he believed Wight & Co.'s accounting practices were improper, it presented the management representation letters and sought to introduce them into evidence. At a sidebar, Webber complained that Wight & Co. had been in possession of the letters before trial but never provided him with copies before doing so on cross-examination. In response, Wight & Co. pointed out that it had subpoenaed the documents from Wolf and had given Webber a copy of that subpoena, which specifically requested all documents Wolf had received from Wight & Co. that Webber had signed as CFO. Wight & Co. also noted that it had subpoenaed DeLand to bring the letters to court and testify about them and had disclosed him as a witness during discovery, but that Webber, who had also disclosed DeLand as a witness during discovery, never chose to depose him or anyone else at Wolf or to request any documents from that company. After reviewing these arguments, the trial court commented that Webber himself had signed the letters, "so he ha[d] to know about" them. The court also closely examined Wight & Co.'s subpoena and noted that it was specific as to the documents it sought from Wolf. Based on this, the court allowed the letters into evidence, stating "[i]f this isn't notice, I don't know what is." The court did, however,

grant Webber's request for a recess to review the letters with his counsel. Upon further cross-examination regarding the letters, though Webber insisted he did not remember reading them, he admitted that he had signed them, that he had known they would be presented to Wolf, that they represented that Wight & Co.'s financial practices were in accordance with generally accepted accounting principles, and that this was in direct contradiction to the allegations he was making in his suit against Wight & Co. regarding his termination.

We find, based on the particular circumstances presented here, that the trial court did not abuse its discretion in admitting the letters into evidence. First, these letters comprised relevant evidence which went to the underlying issue in this cause: the reason for Webber's termination. Wight & Co. devoted much of its cross-examination of Webber to his actions and feelings while employed at the company, including his views on the phantom-stock plan which Wight proposed and then abandoned. Webber had insisted in his complaint and during his testimony that he was fired solely because he was vocal in his objections to Wight & Co.'s improper accounting practices, not, for example, because he complained that his salary was too low or Wight's was too high. Yet, the letters demonstrated that Webber had consistently been representing to outsiders that there were no improper accounting practices and that Wight & Co. had been correctly recording all its transactions and expenditures. These letters, then, would tend to disprove Webber's contention that he had been openly criticizing Wight & Co.'s actions and that this was the reason he was terminated, thereby making them relevant and admissible at trial, particularly since DeLand, Bedar and Webber himself all testified that Webber never voiced his concerns to outsiders.

Moreover, we do not believe that Webber suffered any prejudice here. The record affirmatively demonstrates that Webber knew that Wight & Co. had subpoenaed the letters from Wolf. He also knew that Wight & Co. had subpoenaed DeLand to testify regarding these letters. In fact, Webber himself had revealed in discovery that he too would call DeLand to testify; however, Webber never deposed DeLand regarding the letters, never subpoenaed them of his own accord, and never asked Wight & Co. to allow

him to view the letters even though he knew that it had subpoenaed them. Most significantly, the letters were signed by Webber himself, documents that he admitted he prepared as part of his duties while working for Wight & Co. Therefore, Webber knew the letters existed and knew the gist of what they contained. Webber admitted at trial, and DeLand confirmed through his own testimony, that these were forms letters Webber was required to prepare to close every audit in his capacity as CFO. We fail to see, then, any merit to Webber's argument that the presentation of these letters during his cross-examination or their admission into evidence caused him "surprise." Finally, the trial court granted Webber a recess to allow him to confer with counsel before answering any questions about the letters, and allowed Webber the opportunity to testify about the letters in his own words during redirect examination. When afforded this opportunity, Webber devoted his testimony to insisting that while he may have signed the letters, he had not necessarily read them at the time.

Accordingly, in light of the fact that Webber knew Wight & Co. had subpoenaed the letters, that the trial was stopped so he could review them and, most critically, that he had prepared and signed them himself, we find no abuse of discretion on the part of the trial court in admitting the letters into evidence at this trial.

### D. Harmless Error

Ultimately, a new trial should be granted only when the jury's verdict is contrary to the manifest weight of the evidence. See York, 222 Ill. 2d at 178. This occurs when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based on the evidence presented at trial. See York, 222 Ill. 2d at 179. Specifically, credibility determinations, the resolution of inconsistencies and conflicts in testimony, and the weight to be given to evidence lie exclusively within the province of the jury, and we, as a reviewing court, may not usurp the jury's function or set aside its verdict in order to substitute our judgment regarding these concepts. See York, 222 Ill. 2d at 178.

Upon our review of the record as a whole, we conclude that, even were the instances cited here erroneous, they amounted to only harmless error, as there was ample evidence presented at trial to support

26

the jury's verdict against Webber's retaliatory discharge claim. See, *e.g.*, <u>Krklus v. Stanley</u>, 359 Ill. App. 3d 471, 486 (2005) (error in decision to admit or exclude evidence is harmless unless resulted in prejudice); <u>Baier v. Bostitch</u>, 243 Ill. App. 3d 195, 207 (1993) (error in jury instruction will be harmless unless instruction was faulty or misled jury).

Webber testified at length regarding his allegations that he was terminated because he objected to Wight & Co.'s improper accounting practices, detailing incidents where he was ordered by Wight to make inappropriate changes in company ledgers, which he refused to do. Webber also presented testimony from witnesses including Steinberg, Duffy and Rangel discussing how he improved Wight & Co.'s financial situation upon his appointment as CFO and head of the accounting department. However, several other witnesses testified that Webber's termination was due to other reasons.

Wight testified that Webber was constantly arguing about salaries and the lack of stock options. Wight also discussed a decline in both Webber's personality and work skills; Webber was becoming an increasingly poor communicator and he was performing more irrelevant tasks instead of necessary work. Wight further explained that he fired Webber because he had been leaking confidential information, his senior managers and outside consultants were unhappy with Webber's performance, and it was time for the company to go in a new direction. Similarly, Ferreri testified that Webber was not managing the accounting department or staff effectively on either a personal or professional level. He stated that department employees were threatening to quit if Webber remained in charge, that Webber would blame others when things went wrong, and that Webber constantly argued about his salary. Ferreri also testified that Webber was not using the right forms or data to create necessary company reports, leading to convoluted documents and complications in the department, and that Webber had attempted to disclose confidential information to him. Likewise, Pruitt testified that Webber was not using current, specific, or consistent information to prepare his work, exhibiting a decrease in his competency as CFO. Pruitt also stated that Webber was becoming increasingly "combative" and unsupportive of company leadership, namely of Wight, in front of outsiders. In addition, Adams testified that upon her appointment as CFO,

she noted an inefficient, corrupt and outdated system in place at the accounting department; Mary Diebert testified that Webber had created friction in the department; and Carlson testified that Webber had disclosed confidential information to him that should not have been discussed by Webber. Perhaps most significant, Webber himself admitted during his testimony that he was upset with Wight & Co. because it refused to employ the stock plan it had proposed, that he was resentful when Wight told others he was having communication problems with Webber, and that he indeed revealed confidential information he should not have to outsiders while employed at Wight & Co. Webber further admitted, and DeLand and Bedar confirmed in their testimonies, that he never told any independent auditors that Wight & Co.'s financial practices were inappropriate; instead, Webber signed the management representation letters affirming the integrity of the company's finances, knowing that others would be using this information in deciding whether to do business with Wight & Co.

This case rested on a determination by the jury as to who it found to be more credible: Webber and the witnesses he presented asserting he was a model worker who was terminated wrongly in retaliation for his refusal to do something allegedly improper, or Wight & Co. and the witnesses it presented stating that Webber was steadily declining in both his job performance and personal relationships and that he was combative, resentful and leaking confidential company information. The jury sided with the latter and, based on all the evidence we have reviewed here, it is clear to us that its verdict was reasonable. Accordingly, we will not reverse that verdict, as it is not contrary to the manifest weight of the evidence.

## II. Wight & Co.'s Cross-Appeal

Our remaining consideration in this cause is Wight & Co.'s cross-appeal for Rule 137 sanctions against Webber. The trial court denied its request. On appeal, Wight & Co. asserts that this was erroneous because Webber, as evidenced by the management representation letters he signed confirming the legality of Wight & Co.'s financial practices, knew before trial began (either in 1996 when he signed them or at the latest by December 2003 when they were subpoenaed from Wolf) that the allegations in his

complaint asserting he was terminated for objecting to the company's accounting practices were false. Wight & Co. insists that Webber was required to dismiss his complaint because he knew it had no legal basis, and that his failure to do so violated Rule 137 and resulted in "harassing and vexatious" conduct. We disagree.

The decision whether to grant Rule 137 sanctions lies with the sound discretion of the trial court, and we may not disturb its decision unless there is an abuse of that discretion. See <u>Dowd & Dowd, Ltd. v. Gleason</u>, 181 Ill. 2d 460, 487 (1998); see also <u>Barrett v. Fonorow</u>, 343 Ill. App. 3d 1184, 1197 (2003) (abuse occurs "only if no reasonable person would take [the trial court's] view" regarding sanctions). Thus, while we are not precluded from finding an abuse where warranted, we must afford the trial court considerable deference in its decision to deny sanctions. See <u>Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.</u>, 315 Ill. App. 3d 238, 244 (2000). The party requesting the imposition of Rule 137 sanctions bears the burden of proof and must show that the opposing party made untrue and false allegations without reasonable cause for the mere purpose of invoking harassment or undue delay of the proceedings. See <u>Technology Innovation</u>, 315 Ill. App. 3d at 243-44. Because of Rule 137's penal nature, courts must construe it strictly, must make sure the proposing party has proven each element of the alleged violation with specificity, and should reserve sanctions for the most egregious cases. See <u>Dowd</u>, 181 Ill. 2d at 487; <u>Technology Innovations</u>, 315 Ill. App. 3d at 244; <u>Barrett</u>, 343 Ill. App. 3d at 1197. Ultimately, the primary consideration on review is whether the trial court's decision was "informed, based on valid reasoning, and follows logically from the facts." <u>Technology Innovations</u>, 315 Ill. App. 3d at 244.

Based on our review of the record here, we do not find any abuse in the trial court's determination that Webber's actions in this cause did not merit the imposition of Rule 137 sanctions.

Wight & Co. relies heavily on <u>Walsh v. Capital Engineering & Manufacturing Co.</u>, 312 Ill. App. 3d 910 (2000), for its contention of sanctionable conduct on the part of Webber. In <u>Walsh</u>, the plaintiff alleged that the defendants were engaged in a scheme to transfer profits and assets in an effort to deprive

her of her financial interests in a trust. The plaintiff had hired a forensic CPA as her accounting expert to review her case, and it was his reports that provided the basis for the allegations in her complaint. As discovery progressed, the expert testified in his deposition that several of the allegations contained in the complaint were no longer at issue. The defendants sought to strike these allegations, but the plaintiff claimed she had other evidence to substantiate them at trial. Though the case eventually settled, the defendants filed a motion for sanctions pursuant to Rule 137, alleging that the plaintiff had the duty to amend or withdraw her complaint once she knew the allegations could not be supported. The trial court denied the motion. On appeal, the Walsh court stated that while the plaintiff was not obligated to withdraw the specific allegations in question or amend the complaint to reflect her expert's renunciation of the allegations, she was obligated to be forthcoming with the defendants and the court regarding her expert's negative opinion of the allegations. See Walsh, 312 Ill. App. 3d at 916. Concluding that this failure forced the defendants to prepare for trial on allegations which the plaintiff admittedly had no evidence to substantiate at trial, the Walsh court reversed and remanded the cause for a determination of appropriate sanctions pursuant to Rule 137. See Walsh, 312 Ill. App. 3d at 919.

The instant case is readily distinguishable from Walsh. The evidence discovered in Walsh made objectively clear, as admitted by the plaintiff's own expert witness whose original opinions had formed the basis of her complaint, that certain issues she had raised therein were no longer viable or contestable issues by the time of trial. Because of this, as the reviewing court found, and contrary to the plaintiff's insistence, there could be no additional evidence to substantiate these (non)issues. Essentially, then, portions of what the Walsh plaintiff had asserted in her complaint became inconsistent with the state of the case before trial.

This was not the situation confronting Webber, even with the discovery or his knowledge of the management representation letters. Contrary to Wight & Co.'s assertion, the letters and Webber's allegations in his complaint were not "utterly inconsistent statements" rendering them mutually exclusive or "nonissues." We understand Wight & Co.'s argument that the letters Webber signed vouched for the

30

integrity of the company's financial practices, while his complaint states that he was dismissed for "objecting to [the company's] financial practices." However, the trial court here noted that Webber signed the letters as the company CFO and that audits could not be completed without these letters; in other words, this was part of his job, "all part of what he was supposed to do."

In much the same manner, we conclude that the letters and Webber's complaint are not irreconcilable. Instead, it is quite reasonable to assume that the statements contained in both are true: at the time Webber signed the letters vouching for the integrity of the company finances there were no legal violations or misrepresentations during the audits, yet he could believe at the same time that Wight & Co. was manipulating the accounting department in some form, that this was improper (though not illegal), and that his voicing of this concern was the reason for his termination. After all, several witnesses both inside and outside Wight & Co. had testified that every company expense was accounted for during the audits, while Webber testified that he believed the bookkeeping practices were improper, but not necessarily illegal. Therefore, the letters' expression that Wight & Co.'s financial practices did not amount to legal violations does not conflict with Webber's personal belief that it was his vocal concern of potential impropriety that resulted in his termination. This formed the basis for his retaliatory discharge claim and, though disregarded by the jury in the end, he presented sufficient evidence at trial through testimony and documents to substantiate it. See, *e.g.*, Barrett, 343 Ill. App. 3d at 1199, quoting Peterson v. Randhava, 313 Ill. App. 3d 1, 7 (2000) (" '[a] court should not impose sanctions on a party for failing to conduct an investigation of facts and law before filing if he presents objectively reasonable arguments for his position, regardless of whether those arguments are unpersuasive or incorrect' "); Olsen v. Celano, 234 Ill. App. 3d 1045, 1053 (1992) (that facts are ultimately adverse to pleadings "is not enough to warrant an award of attorney fees").

Ultimately, we find that this is not an egregious case meriting the imposition of sanctions. Rather, we believe, based on the record before us, that the trial court's decision was reasonable and logical in light of the facts presented and, thus, that its determination to deny sanctions was not an abuse of

discretion.

CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court with respect to the jury's verdict and the denial of sanctions.

Affirmed.

McNULTY and O'MALLEY, JJ., concur.